OPINION OF THE COURT
Bellacosa, J.
In this defamation action, the plaintiff public figure won a multimillion dollar jury verdict against defendant, owner of a radio and television station. The Appellate Division affirmed the judgment by a 3 to 2 vote and defendant appealed as of right. We conclude that the order should be reversed and a new trial ordered, for the sole reason that the trial court’s instructions to the jury on the falsity issue, involving particularly the retraction of earlier broadcasts, impermissibly withdrew from the jury crucial interrelated issues of credibility and actual malice that are solely the province of the fact finders.
On May 6, 1982, an abduction and beating occurred in the area serviced by the defendant’s television and radio stations. The next day, a report of the incident was broadcast during the defendant’s noon news telecast and during the 12:45 p.m., 1:45 p.m. and 2:45 p.m. news segments over defendant’s radio station. The news report consisted of the following statement:
"The FBI is investigating a beating and abduction in Cheektowaga last night. Today, investigators are questioning John Prozeralik, the owner of John’s Flaming Hearth Restaurant, in Niagara Falls, New York. Prozeralik was either tricked or forced to the Howard Johnson’s in Cheektowaga according to police, where he was beaten with a baseball bat or pipe, and tied up. Today, the FBI is *471 investigating the possibility that Prozeralik owed money to organized crime figures.”
Shortly after the noon broadcast, plaintiff and his attorneys notified defendant that plaintiff was not the victim in this story. Defendant then verified that the actual victim was one David Pasquantino. It broadcast the following retraction during its 6:00 p.m. and 11:00 p.m. televised newscasts:
"Tonight, we have developments on two fronts in the abduction that ended yesterday in a Cheektowaga motel. First, the victim is not, and I repeat, is not, John Prozeralik, the operator of John’s Flaming Hearth Restaurants. The FBI earlier today said and confirmed the victim was Prozeralik, but our independent investigation is revealing he was not involved” (emphasis added).
Plaintiff’s action alleged that defendant’s noon, 6:00 p.m. and 11:00 p.m. televised newscasts and its 12:45 p.m., 1:45 p.m. and 2:45 p.m. radio broadcasts defamed him. At trial, plaintiff established that his name was first introduced as the possible victim during defendant’s employees’ discussion on the morning of the broadcasts. A reporter testified that during their meeting and conversation regarding the incident and the possible identity of the victim, who was thought to be a Niagara restaurateur, one of the reporters said, "I wonder if it was John Prozeralik. * * * That’s the first name that comes to mind.” This was a purely speculative query with no basis in fact, investigation or information acquired by defendant. The only connection was that Prozeralik happened to be one of many Niagara restaurateurs.
Defendant’s noon anchor, DiBiasi, used this supposition to inquire of the FBI whether this Prozeralik name could be that of the victim. The testimony of DiBiasi and the FBI’s media coordinator, Agent Thurston, as to what transpired between them during this telephone call differs sharply. DiBiasi testified that she mentioned Prozeralik’s name to Thurston, and he told her, "You can go with that unless I call you back.” Thurston unequivocally denied making any such statement. He testified that he did not give or confirm Prozeralik’s name. He did not tell DiBiasi she could go with Prozeralik’s name if he did not call back. Moreover, he never used that methodology in dealing with the press. He added that he may have told her only that he would call her back if something developed.
The evidence at trial also revealed that after plaintiff and *472 his attorneys contacted the station, defendant’s news director, Ridge, also called Thurston. Thurston informed Ridge that he had not known the name of the victim when he spoke to DiBiasi and that he did not confirm Prozeralik’s name. The proof at trial showed that plaintiff’s reputation was grievously damaged and his various, substantial and law-abiding business interests were ruined.
The trial court instructed the jury, over defendant’s objection, that the initial broadcasts and the retraction were false as a matter of law. The jury returned a verdict in Prozeralik’s favor in the amount of $18 million, which was reduced to a judgment in the amount of $15.5 million; $5.5 million in financial loss and $10 million in punitive damages. On this appeal from the Appellate Division affirmance, the defendant contends that the trial court erred when it instructed the jury that the retraction was false as a matter of law; that plaintiff did not prove actual malice; that the award of punitive damages must be set aside, since there was no showing of common-law malice; and that the damages award is excessive.
L
The erroneous jury instruction on the issue of falsity requires reversal and new trial. Defendant demonstrates that the jury instructions impermissibly impinged on the jury’s resolution of credibility and actual malice by, in effect, directing the jury to accept FBI Agent Thurston’s version of the telephone conversation between him and DiBiasi. In pertinent part, the jury was instructed that:
"In the case presently being tried before you, I have determined as a matter of law that the defendant in its May 7th, 1982, 12 noon television broadcasts and its similar May 7, 1982, radio broadcasts and in its May 7th, 1982, 6 p.m. and 11 p.m. television broadcasts made certain false statements about the plaintiff which it communicated to its viewing and listening audience. This means that it will not be necessary for you to decide whether or not the plaintiff has proved those elements of his libel case.”
This is not some isolated, insignificant feature of the case. It cuts to the heart of the critical elements necessary to prevail in such cases.
*473 Under well-established principles of law, a plaintiff in a defamation action "has the burden of showing the falsity of factual assertions” (Immuno AG. v Moor-Jankowski, 77 NY2d 235, 245 [citations omitted], cert denied 500 US 954). Defendant does not dispute that Prozeralik was not the victim and, accordingly, there was no error in instructing that the initial broadcasts were false as a matter of law. But whether Thurston had "said” or "confirmed” that Prozeralik was the victim or DiBiasi could have reasonably understood him to say so, is a feature of the case on which defendant is entitled to fact finder resolution. As to that, the jury should have been given the choice of accepting or rejecting the whole or parts of the testimony of Thurston and DiBiasi, including in the context of and in relation to the later telephone call between Ridge and Thurston.
It is well settled that "[assessment of the weight of the evidence and the credibility of witnesses is a function of the finder of fact” (Dominguez v Manhattan & Bronx Surface Tr. Operating Auth., 46 NY2d 528, 534). By instructing the jury that the retraction was false as a matter of law, the trial court withdrew that function from the jury and resolved the critical issue of whether the defendant "realized that [its] statement was false or * * * subjectively entertained serious doubt as to the truth of [its] statement” (Bose Corp. v Consumers Union of U. S., 466 US 485, 511, n 30). The court effectively directed the jury’s verdict by allowing it to disregard DiBiasi’s testimony as incredible and to accept Thurston’s testimony that he had not confirmed Prozeralik’s name to her. That DiBiasi could not have reasonably believed that Thurston had confirmed the plaintiffs name is a reasonable inference from the court’s directive. In effect, mandating a verdict on such determinative issues altered the crucial balance and rules by which such cases must be adjudicated (compare, PJI 3:27 [1992 Supp]).
Since the trial court failed to tender to the jury its full range of fact-finding options in regard to the retraction and the conversation between Thurston and DiBiasi, we have no choice but to reverse and order a new trial.
IL
We must next address defendant’s argument seeking outright dismissal of plaintiffs case, a view urged by the dissent *474 ing Justices at the Appellate Division and by the partial dissent in this Court.
By stipulation of the parties, plaintiff is a public figure. To prevail in a defamation suit, he would have to prove with evidence of "convincing clarity” "that the statement was made with 'actual malice’ — that is, with knowledge that it was false or with reckless disregard of whether it was false or not” (New York Times Co. v Sullivan, 376 US 254, 285-286, 279-280; see also, Harte-Hanks Communications v Connaughton, 491 US 657, 659). This rule was promulgated in recognition "of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on [public figures]” (New York Times Co. v Sullivan, 376 US, at 270, supra). "The burden of proving 'actual malice’ requires the plaintiff to demonstrate with clear and convincing evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement” (Bose Corp. v Consumers Union of U. S., 466 US 485, 511, n 30, supra). The Supreme Court has emphasized "that the actual malice standard is not satisfied merely through a showing of ill will or 'malice’ in the ordinary sense of the term” (Harte-Hanks Communications v Connaughton, 491 US, at 666, supra). It must be established that the "defendant * * * made the false publication with a 'high degree of awareness of . . . probable falsity’ * * * or must have 'entertained serious doubts as to the truth of his publication’ ” (id., at 667).
On appeal in such cases, courts have "a constitutional duty to 'exercise independent judgment and determine whether the record establishes actual malice with convincing clarity’ ” (id., at 659 [emphasis added]).
"[J]udges * * * must exercise such review in order to preserve the precious liberties established and ordained by the Constitution. The question whether the evidence in the record in a defamation case is of the convincing clarity required to strip the utterance of First Amendment protection is not merely a question for the trier of fact. Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional *475 threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice’ ” (Bose Corp. v Consumers Union of U. S., 466 US, at 510-511, supra).
Thus, although this Court is "usually constrained to review only the law and without the power to disturb affirmed findings of fact,” we must scrutinize the evidence of actual malice for "convincing clarity” (compare, Mahoney v Adirondack Publ. Co., 71 NY2d 31, 39, with Cohen v Hallmark Cards, 45 NY2d 493, 499).
This heightened review responsibility does not preclude consideration of all of the factual record in full, including "circumstantial evidence” and evidence of the defendant’s motive, and the findings of the fact finder (see, Harte-Hanks Communications v Connaughton, 491 US 657, 668, supra). Rather, our review of the Appellate Division’s analysis of the trial evidence necessarily encompasses all of these usual factors. We must be sure "undue weight” was not given to the jury’s findings in the usual mode and must be satisfied that an "independent review” was conducted.
Mindful of this special review power in the particular procedural framework of this argument by defendant, we conclude that plaintiff met his prima facie evidentiary burden of establishing actual malice sufficient to allow the jury (had it been instructed correctly) to find that defendant acted with a high degree of awareness of "probable falsity” or entertained "serious doubts” as to the truth of the broadcasts (Harte-Hanks Communications v Connaughton, 491 US, at 688, supra). Plaintiff adduced cogent direct evidence from which a jury could have inferred that defendant knew or suspected that the Prozeralik was not the victim in this story. It is undisputed that the actual victim, David Pasquantino, had been correctly identified by name in the May 6th 11:00 p.m. broadcast of a rival television station — the night before defendant’s broadcasts. The stations were engaged in their market "sweeps” competition at the time. Uncontroverted testimony from defendant’s own witnesses showed that the only reason defendant’s news employees speculated about plaintiff’s name, without any basis or source whatsoever, was because they believed that the organized crime abduction victim was a Niagara restaurateur. Prozeralik was one of countless restaurateurs in the region but had no connection whatsoever to the crime, the criminal or the story, except for defendant’s em *476 ployees’ rootless speculation and then glaring projection of his name into the public’s eye.
Thurston emphatically denied that he had told DiBiasi that if he did not call her back she could go with Prozeralik’s name. He added that during his tenure as upstate New York media coordinator for the FBI, he had never told a reporter to treat a no-call-back as a confirmation of a fact inquired about in a reporter-initiated telephone call. News Director Ridge testified that before he aired the retraction he, too, had spoken to FBI Agent Thurston, who denied to him confirming Prozeralik’s name to DiBiasi. Yet, the "retraction” repeated that the FBI had earlier told the station that Prozeralik was the victim. While falsity alone and negligence alone would not be sufficient to sustain plaintiffs burden, there is enough in this case to submit the issue of actual malice to a jury for factual resolution.
It is important at this juncture to note that this case is sufficiently distinguishable from Mahoney v Adirondack Publ. Co. (71 NY2d 31, supra), so heavily relied upon by defendant and the partial dissent, so as to withstand and avoid its broad precedential impact. There, defendant had run a story in the sports section of its newspaper in which a reporter, who had witnessed a local high school football game, reported that the coach had "verbally abused” the players. The reporter based his article on statements that he had allegedly heard. The evidence at trial established that the plaintiff had not uttered the sentence attributed to him ("get your head out of your &!(!!(&”); although what he said was similar ("get your head up”) (id., at 37-38). The plaintiff, the player to whom he was speaking and the player’s father, all testified as to. what was actually said. Additional witnesses testified "that they did not hear plaintiff use profane language” (Mahoney v Adirondack Publ. Co., 71 NY2d, at 40, supra). This Court found that although the evidence supported the jury’s falsity finding, "[t]here was no evidence [as to actual malice] to negate the possibility that [the reporter] simply misunderstood plaintiff” (id., at 40). Significantly, "[t]here was no direct evidence that [the reporter] or his employer knew or suspected the plaintiff did not utter the words attributed to him in the article” (id., at 39). There was nothing outside the parties’ differing versions of the incident to support the jury’s conclusion that the coach’s testimony was accurate and the reporter’s version was inaccurate. Moreover, there was no evidence to support the jury’s conclusion that the reporter knew or should have *477 known that his understanding of what happened was false. On the contrary, it was more than likely that observers hearing the statement from different locations during the noise and confusion of a high school football game would differ in their understanding of the coach’s remarks. Thus, the evidence in Mahoney did not meet constitutional standards for establishing that the reporter knew or suspected that his version of events was inaccurate. Therefore, we reversed the Appellate Division and held that actual malice had not been established as a matter of law.
The evidence and context in the instant case cogently present a decidedly different and stronger case than Mahoney. A highly and significantly discrete feature of this case is the uncontroverted evidence that the plaintiff’s name was initially injected randomly by defendant’s own employees merely because he happened to be a Niagara restaurateur. Direct evidence was presented here from which the jury was entitled to infer and find that the defendant "knew or suspected” that Prozeralik was not the victim. Strikingly here, Agent Thurston gave categorical testimony that he had not confirmed Prozeralik’s name and that he never used the no-call-back method to confirm a factual inquiry from the media.
For assessing the prima facie proof burden to get to a jury, even within the special heightened appellate review standard, this Court may include in its over-all consideration the strengths and weaknesses of the whole evidentiary record. The heightened test cannot compel the reviewing court to deprive plaintiff of his right to a jury resolution in these circumstances. In answering defendant’s argument that the Court should dismiss as a matter of law, we should also consider, along with everything else, the high improbability of defendant’s explanation as it was offered in the face of Thurston’s testimony on some key facts. For example, the context of his version of events includes that the truth was objectively verifiable, since the name of the actual victim had already been transmitted across defendant’s competitor’s airwaves, thus contradicting defendant’s story that Thurston officially implicated Prozeralik in some way to defendant (see, Harte-Hanks Communications v Connaughton, 491 US, at 692, supra ["Although failure to investigate will not alone support a finding of actual malice * * * the purposeful avoidance of the truth is in a different category”]). This adds an independently objective verifying feature, not present in Mahoney (71 NY2d 31, supra). Next, DiBiasi’s central claim was contrary to *478 Thurston’s standard practice in dealing with reporters. As we have observed, he had virtually no motive to lie, contrasted to defendant’s employees’ motivation to minimize and rationalize their gross blunder. Lastly, for Thurston to falsely report and testify in this matter would place him in direct violation of his sworn public duties for no reason beneficial to him or the FBI.
Despite the improbabilities, defendant would have this Court conclude that no prima facie case was even presented because its employees might have held an untarnished subjective state of mind. That approach and analysis is not constitutionally compelled by Bose (466 US 485, supra) or Mahoney (71 NY2d 31, supra), and it would erect a logically impossible test which, by its practical application of governing precedents, would inevitably result in no defamation case ever qualifying for jury resolution. The outcome of these complex, difficult and sensitively nuanced controversies cannot be that rigid or one-sided. Nor as a practical matter should such dispositions be placed into the unilateral control of defendants. Under the facts and circumstances of this case, enough evidence was adduced to convince us with the requisite clarity and cogency that the jury was rightly given the obligation of resolving credibility and the competing versions of what happened.
Thus, since there was sufficient and convincingly clear evidence to warrant submitting the case to the jury for its assessment of actual malice and liability, plaintiffs case should not be dismissed.
ra.
It is incumbent upon the Court also to address the punitive damages issue. In Mahoney v Adirondack Publ. Co., this Court did not have to decide "whether plaintiff’s proof of common-law malice was sufficient to sustain [an award of punitive damages] or whether punitive damages are ever recoverable in [defamation] actions involving [public figures]” (71 NY2d 31, 41, supra). Were we not ordering a new trial, we might be bound by a law-of-the-case-unobjected-to instruction to the jury on the issue. The trial court gave the following jury instruction on punitive damages:
"[P]unitive damages may be awarded to punish a defendant who * * * has acted maliciously and to discourage others from doing the same. * * * A statement is made maliciously if it is made with deliberate intent to injure or with a wanton and *479 reckless disregard of its truth and its injurious effect upon the person upon whom it was made. * * * If you find that the defendant’s employees knew the statements in its broadcast were false or the information received by the defendant’s employees from Agent Thurston did not tend to establish the truth of the statements contained in the broadcasts or that the broadcasts did not accurately and completely state the information received from Agent Thurston, after considering all the evidence, you may find that the defendant’s employees acted with malice”.
This instruction does not fully or accurately inform the jury of the principles governing this important segment of such cases (see, PJI 3:38). Under the procedural circumstances of this case, we note our disagreement with the instruction given, so as to provide guidance on the new trial and to settle the issue for future cases.
Punitive damages are awarded in tort actions "[w]here the defendant’s wrongdoing has been intentional and deliberate, and has the character of outrage frequently associated with crime” (Prosser and Keeton, Torts § 2, at 9 [5th ed 1984]). That author also teaches that:
"Something more than the mere commission of a tort is always required for punitive damages. There must be circumstances of aggravation or outrage, such as spite or 'malice,’ or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that the conduct may be called wilful or wanton” (Prosser and Keeton, Torts § 2, at 9-10 [5th ed 1984]).
Actual malice, as defined in New York Times Co. v Sullivan (376 US 254, supra), is insufficient by itself to justify an award of punitive damages, because that malice focuses on the defendant’s state of mind in relation to the truth or falsity of the published information (see, e.g., McCoy v Hearst Corp., 42 Cal 3d 835, 727 P2d 711, 736 [1986], cert denied 481 US 1041; compare, Liberman v Gelstein, 80 NY2d 429, 437). This does not measure up to the level of outrage or malice underlying the public policy which would allow an award of punitive damages, i.e., "to punish a person for outrageous conduct which is malicious, wanton, reckless, or in willful disregard *480 for another’s rights” (Vassiliades v Garfinkle’s, Brooks Bros., 492 A2d 580, 593 [DC]; see also, Liberman v Gelstein, 80 NY2d 429, supra; Hartford Acc. & Indem. Co. v Village of Hemp-stead, 48 NY2d 218, 227). This kind of common-law malice focuses on the defendant’s mental state in relation to the plaintiff and the motive in publishing the falsity — the pointed factors that punitive damages are intended to remedy.
While theoretically, and upon proof and instructions, punitive damages may be available in such cases, the evidence on this record did not support the conclusion that Prozeralik was reported as the victim of this violent crime out of hatred, ill will, spite, criminal mental state or that traditionally required variety of common-law malice. Whether that could be shown on the new trial remains to be seen and demonstrated.
IV.
The other issues in the case, to the extent reviewable, warrant no further discussion.
Accordingly, the order of the Appellate Division should be reversed and a new trial ordered, with costs to abide the event.