728 So.2d 253 (1998)
CADWALADER, WICKERSHAM & TAFT, Appellant,
v.
James W. BEASLEY, Jr., Appellee.
Nos. 96-2805, 96-3818, 97-0146 and 97-380.
District Court of Appeal of Florida, Fourth District.
December 30, 1998.
Rehearing Denied December 30, 1998.
*254 Sidney A. Stubbs, Jr. of Jones, Foster, Johnston & Stubbs, P.A., and Jane Kreusler-Walsh of Jane Kreusler-Walsh, P.A., West Palm Beach, for appellant.
Montgomery & Larmoyeux and Beasley, Leacock & Hauser, P.A., West Palm Beach, and Joel D. Eaton of Podhurst, Orseck, Josefsberg, Eaton, Meadow, Olin & Perwin, P.A., Miami, for appellee.

ON REHEARING
POLEN, Judge.
We grant CW & T's motion for rehearing in part as it pertains to the trial court's award of punitive damages, and substitute the following in lieu of our original opinion:
In case numbers 96-2805 and 97-380, Cadwalader, Wickersham & Taft (CW & T), a New York law firm, appeals from a final judgment awarding return of capital, interest, profits, and punitive damages to its former partner, James Beasley (Beasley), for wrongful expulsion. CW & T appeals all aspects of the award except for the return of *255 the paid-in capital with interest. Beasley cross-appeals the court's refusal to award him any interest in the firm's goodwill. In case numbers 96-3818 and 97-146, CW & T appeals from an award of attorney's fees and costs to Beasley. On our own motion, we consolidate all four cases at this time. We reverse as to the award of profits, attorney's fees and costs, but affirm as to all other points raised by both parties.
Beasley laterally transferred to become a partner at CW & T in its Palm Beach office in 1989. After his arrival, the Palm Beach office suffered from internal discord and, by 1994, the office was operating at a loss. In response to this situation, the firm's management committee began discussions regarding the termination of up to 30 partners nationwide, including the Palm Beach partners. During this time, and allegedly unbeknownst to CW & T, Beasley was planning to leave the firm. He met secretly with associates in CW & T's Palm Beach office about leaving with him.
The management committee eventually held a day-long meeting on August 7, 1994. Prior to the meeting, the committee members were asked to submit lists of less productive partners to be considered for possible termination. All of the Palm Beach partners were identified on the lists actually submitted. A tentative vote was reached at that meeting and, later that month, the committee formally decided to close its Palm Beach office by year-end 1994. It informed its partners, including Beasley, of its decision on August 30, 1994.
After the announcement, Beasley retained Professor Robert Hillman, who opined that CW & T, pursuant to the partnership agreement, lacked the legal authority to expel him from the partnership. In response to this opinion, CW & T sent a memorandum to Beasley informing him that he was still a partner in the firm. It then offered Beasley either relocation within the firm but in the New York or Washington, D.C. offices, or, a compensation/severance package which included his return of capital, departure bonus, and full shares through December 31, 1994. He was presented with a written withdrawal agreement confirming the same. Beasley, a member of both the Florida and New York bars, rejected the same as impractical.
Settlement negotiations between CW & T and Beasley then continued. On November 9, he sued the firm for fraud and breach of fiduciary duty, among other counts. On November 10, 1994, CW & T sent a letter to Beasley informing him to vacate the premises by 5:00 p.m. the next day. The letter specifically prohibited him from continuing to represent himself as associated with the firm.
After a nine-day bench trial, Judge Cook authored a meticulous and, we believe, exceptionally well-reasoned final judgment. He found that CW & T was authorized to close the Palm Beach office pursuant to the partnership agreement, and that Beasley would have voluntarily left CW & T by year-end 1994 in any event. Nevertheless, since the partnership agreement lacked provisions for the expulsion of a partner except in one limited situation,[1] he found that CW & T had anticipatorily breached the partnership agreement when it announced its plans to close the Palm Beach office in August, and then actually breached the agreement when it sent him the November 10, 1994 letter. The final judgment awarded Beasley his paid-in capital plus interest (which CW & T does not dispute), his percentage interest in the firm's accounts receivables and assets and interest thereon, and punitive damages, all totaling $2.5 + million. The later judgment awarded Beasley's attorneys fees and costs. These amounts are broken down as follows:

- Beasley's paid-in capital of $194,193, plus
 interest at the rate as defined in the
 partnership agreement to the date of
 judgment [$42,199]............................$ 236,392.00
- his percentage interest in the firm's accounts
 receivable, work-in-progress, office
 building and other assets.....................$ 867,110.00
- his profits attributable to the use of his
 right in the property of the dissolved
 partnership...................................$ 935,261.52
- punitive damages..............................$ 500,000.00
- attorney's fees and costs.....................$1,108,247.92

*256 The court, however, rejected Beasley's claims for future lost income and retirement benefits. The appeals and cross-appeal, as set forth above, ensued.

I. WHETHER BEASLEY WAS EXPELLED OR VOLUNTARILY WITHDREW
Under New York Partnership Law's adoption of the Uniform Partnership Act (UPA), partners have no common law or statutory right to expel or dismiss another partner from the partnership; they may, however, provide in their partnership agreement for expulsion under prescribed conditions which must be strictly applied. Gelder Med. Group v. Webber, 41 N.Y.2d 680, 394 N.Y.S.2d 867, 363 N.E.2d 573 (1977); N.Y. Partnership Law § 62(1)(d)(McKinney 1993). Absent such a provision, as here, the removal of a partner may be accomplished only through dissolution of the firm. Dawson v. White & Case, 88 N.Y.2d 666, 649 N.Y.S.2d 364, 672 N.E.2d 589 (1996).
The evidence supports Judge Cook's finding that CW & T intended to remove Beasley as a partner in the firm when it announced it was closing its Palm Beach office by year-end 1994. This finding, in turn, supports the conclusion that CW & T anticipatorily expelled Beasley from the firm. See New York Life Ins. Co. v. Viglas, 297 U.S. 672, 681, 56 S.Ct. 615, 80 L.Ed. 971 (1936)(defining an anticipatory breach as one committed before the time has come, when there is a present duty of performance); American List Corp. v. U.S. News and World Report, Inc., 75 N.Y.2d 38, 550 N.Y.S.2d 590, 549 N.E.2d 1161, 1164-65 (1989).
In reaching this conclusion, we necessarily reject CW & T's argument that Beasley voluntary withdrew from the firm rather than having been expelled. Beasley had been practicing exclusively in South Florida for 22 years, where he built a substantial client base. As the trial court observed, to suddenly uproot to New York or Washington and leave his clients and contacts behind, as the court suggested, would have severely diminished his rainmaking abilities. Under these circumstances, we conclude that his rejecting the offer as impractical was not tantamount to a voluntary withdrawal. See Romano v. Basicnet, Inc., 238 A.D.2d 910, 661 N.Y.S.2d 135, 136 (1997)(holding a breach of employment contract occurred where defendant materially changed plaintiff's duties and that plaintiff did not violate his duty of loyalty to defendant); Fischer v. KPMG Peat Marwick, 195 A.D.2d 222, 226, 607 N.Y.S.2d 309 (1994); Lynch v. Bailey, 275 A.D. 527, 90 N.Y.S.2d 359, aff'd, 300 N.Y. 615, 90 N.E.2d 484 (1949).
Even assuming that CW & T did not anticipatorily breach the agreement on August 29, 1994, we conclude that the November 10, 1994 letter actually expelled him. Even though CW & T notes that Beasley planned on eventually leaving the firm even before it announced the decision to close the Palm Beach office, and that he most likely would not have stayed past 1994, the record does not reflect that he actually had definite plans to leave.
We further reject CW & T's argument that Beasley's suing the firm on November 9, 1994 was tantamount to a voluntary withdrawal. Since CW & T does not dispute the lack of frivolousness of Beasley's lawsuit, but merely takes issue with its allegations, we find its argument unpersuasive. See Cooper v. Isaacs, 448 F.2d 1202 (D.C.Cir. 1971).

II. THE AWARD OF INTEREST
CW & T then argues the trial court erred in finding that a dissolution occurred and contends that, as a "withdrawn partner" pursuant to the agreement, Beasley was entitled to only his paid-in capital. Even if dissolution had occurred, it argues he still only would be entitled to an amount significantly less than that awarded to him. Beasley disputes that he was a "withdrawn" partner pursuant to the agreement, and contends that dissolution was mandated.
Under the partnership agreement, a "withdrawn Partner" is anyone "who was a Partner under this or a prior Firm Agreement." More specifically, the agreement provides that a partner, upon 60 days written notice, may withdraw from the firm at the end of *257 any fiscal year. CW & T argues that, under these provisions, Beasley was technically a withdrawn partner and, thus, was only entitled to his capital contribution plus interest under Paragraph F(2)(a)(i) of the agreement. We, instead, agree with Judge Cook that the term "withdrawn" neither contemplated nor encompassed a partner expelled in the same manner as Beasley, especially since Beasley never provided any written notice of a voluntary withdrawal, and since CW & T conceded at trial that it did not treat Beasley as a "withdrawn partner" after his departure.

Antidissolution Provision
CW & T then argues that concluding a dissolution occurred would conflict with that portion of the agreement which states, "Neither withdrawal of a Partner nor the death of a Partner, nor any other event shall cause dissolution of the Firm [unless 75% of the remaining partners agreed in writing]." (Emphasis added.) It reasons that expulsion of a partner, however wrongful, is an "event" for purposes of this antidissolution clause. We disagree, for to construe this anti-dissolution provision strictly would recognize an implicit expulsion provision where no provision exists. Such an interpretation would be inconsistent with existing law. See Dawson, supra; Empire Properties Corp. v. Manufacturers Trust Co., 288 N.Y. 242, 43 N.E.2d 25 (1942).
Even if the provision were broad enough to cover expulsions, we believe Beasley would still be allowed to seek dissolution of the partnership. Under New York law, any partner has the right to a formal accounting as to partnership affairs if he is wrongfully excluded from the partnership business or possession of its property by his co-partners, or "[w]henever other circumstances render it just and reasonable." N.Y. Partnership Law § 44 (McKinney 1993). Thus, a wrongful exclusion of one partner by a co-partner from participation in the conduct of the business may be grounds for judicial dissolution. See Karrick v. Hannaman, 168 U.S. 328, 18 S.Ct. 135, 42 L.Ed. 484 (1897)(holding that an antidissolution provision in partnership agreement should not prevent dissolution when one partner wrongfully excludes the other); see also Clark v. Gunn, 134 N.Y.S.2d 206, 207 (App.Div.1954)(holding that, where the partnership agreement in question contained no provisions for the majority's expulsion of the minority, and that is what the plaintiffs attempted to do, the partnership may be dissolved under partnership law); Bailly v. Betti, 241 N.Y. 22, 148 N.E. 776 (1925)(holding an attempted exclusion of partner from the firm business warranted an action for an accounting though the time of dissolution fixed by the articles had not arrived and no dissolution was asked).
Since Beasley was expelled, his damages are to be assessed under § 71 of New York Partnership Law, and not under the partnership agreement. Since there is competent, substantial evidence in the record to support both the method and result used to calculate his interest in the firm's assets, we affirm the award of interest in the amount of $867,110.00.

III. THE AWARD OF PROFITS
Under New York law, when a partnership continues following the expulsion of a partner, that partner has the right to receive the value of his partnership interest as of the date of dissolution, either with interest from the date of dissolution, or, at his election, the profits attributable to the use of his right in the property of the dissolved partnership. N.Y. Partnership Law § 73 (McKinney 1993).[2]
Strictly construing this statute, Beasley was entitled to either interest on the value of his interest in the dissolved partnership ($867,110) or profits attributable to the use of his right in the property of the firm on top of the $867,110. Beasley elected to receive the profits attributable to his use through the date of judgment instead of interest at 3% over prime (as defined in the agreement). Based on his expert, Mr. Burgher, having calculated the profits attributable to the use of his right in the property *258 based on the firm's total earnings to reflect what Beasley's total income would have been had he stayed at the firm from November, 1994 through May, 1996, the court awarded Beasley profits in the amount of $935,261.52.
CW & T argues that, as a matter of law, awarding Beasley $935,261.52 in "profits" based on this calculation was incorrect. Relying on Kirsch v. Leventhal, 181 A.D.2d 222, 586 N.Y.S.2d 330 (1992), it reasons that Beasley should not be entitled to profits resulting from the postdissolution services of the remaining partners. We agree. To the extent that some of the firm's postdissolution profits may be attributable to the postdissolution efforts, skill, and diligence of the remaining partners, the firm's fee as a result of those services should not be proportionately attributable to the use of the departing partner's right in the property of the dissolved partnership. Id. (citation omitted); accord Shandell v. Katz, 217 A.D.2d 472, 629 N.Y.S.2d 437 (1995); Timmermann v. Timmermann, 272 Or. 613, 538 P.2d 1254, 1264 (1975)(en banc). As the record does not clarify what portion, if any, of the postdissolution profits earned on services (as opposed to firm assets) was attributable to Beasley, we find that Beasley failed to carry his burden of showing what the quantum meruit value of his services was after he left the firm.
Beasley tries to distinguish Kirsch and the other cases upon which CW & T relies based on the fact that the partners in those cases were not wrongfully expelled. If recognized, this distinction may help justify the court's award, but it would seem to be an impermissible extension of § 73. As an equitable consideration, although the facts underlying Beasley's departure appear much more egregious than in the cases CW & T cites, Beasley still had "dirt under his fingernails."[3] While CW & T should not be unjustly enriched through its wrongful expulsion of Beasley, neither should Beasley be unjustly enriched by reaping the rewards of other partners' individual efforts. Accordingly, we reverse this portion of the award and remand the case to the trial court to calculate Beasley's interest on $867,110 at 3% over prime, the defined rate pursuant to the agreement, under § 73.

IV. THE IMPOSITION OF PUNITIVE DAMAGES
CW & T then argues that the court's award of punitive damages was both unwarranted and erroneous as a matter of law. It asserts that the court's failure to award Beasley compensatory damages on his breach of fiduciary duty claim barred an award of punitive damages under New York law. Under New York law, the nature of the conduct which justifies an award of punitive damages is conduct having a high degree of moral culpability, or, in other words, conduct which shows a "conscious disregard of the rights of others or conduct so reckless as to amount to such disregard." Home Ins. Co. v. American Home Products Corp., 75 N.Y.2d 196, 551 N.Y.S.2d 481, 550 N.E.2d 930, answer to certified question conformed to 902 F.2d 1111 (2d Cir.1990); accord Prozeralik v. Capital Cities Communications, Inc., 82 N.Y.2d 466, 605 N.Y.S.2d 218, 626 N.E.2d 34, 41-42 (1993) (citation omitted). CW & T is correct in arguing that punitive damages are generally recovered only after compensatory damages have been awarded; see, e.g., Maier-Schule GMC, Inc. v. General Motors Corp. (GMC Truck and Bus Group), 850 F.Supp. 1095 (W.D.N.Y.1994), aff'd, 62 F.3d 1412 (2d Cir.1995); however, since the purpose of punitive damages is to both punish the wrongdoer and deter others from such wrongful behavior, as a matter of policy, courts have the discretion to award punitive damages even where compensatory damages are found lacking. Reynolds v. Pegler, 123 F.Supp. 36, 38 (S.D.N.Y.1954), aff'd, 223 F.2d 429 (2d Cir.1955); accord Kent v. City of Buffalo, 36 A.D.2d 85, 319 N.Y.S.2d 305; reversed on other grounds, 29 N.Y.2d 818, 327 N.Y.S.2d 653, 277 N.E.2d 669 (1971).
We believe CW & T should not be insulated from the consequences of its wrongdoing simply because Beasley suffered no compensatory damages. As the court found, CW & T "was participating in a clandestine plan to wrongfully expel some partners for the financial gain of other partners. Such activity *259 cannot be said to be honorable, much less to comport with the `punctilio of an honor.'" Because these findings establish that CW & T consciously disregarded the rights of Beasley, we affirm the award of punitive damages.

V. THE AWARD OF ATTORNEY'S FEES, EXPERT WITNESS COSTS AND TRIAL COSTS
As to the trial court's award of attorney's fees and costs, CW & T argues that Chapel v. Mitchell, 84 N.Y.2d 345, 618 N.Y.S.2d 626, 642 N.E.2d 1082 (1994) and A.G. Ship Maintenance Corp. v. Lezak, 69 N.Y.2d 1, 511 N.Y.S.2d 216, 503 N.E.2d 681 (1986) support the "American Rule" which dictates that attorney's fees cannot be awarded absent a statute or contract authorizing the same. As such, it correctly maintains that the trial court misapplied this law in ordering that CW & T recompense Beasley for his attorney's fees and costs.
Supporters of the American rule have argued that, since litigation is uncertain, one should not be penalized for merely defending or prosecuting a lawsuit, and that the poor might be unjustly discouraged from instituting actions to vindicate their rights if the penalty for losing included an award of attorney's fees to their opponents. Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 718, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967). Exceptions to the American rule have been developed, however, "when overriding considerations of justice seemed to compel such a result." Id. Beasley principally relies on one such exception, found in Sprague v. Ticonic Nat. Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939), to support the court's award.
Sprague involved a plaintiff who deposited trust funds with a bank, some of which were to be secured by a corresponding amount of bonds. Id. at 162, 59 S.Ct. 777. Later, after the successor to the bank entered receivership, the plaintiff sought, on behalf of one of fifteen similarly situated trusts, to place a lien upon the proceeds of the bonds securing the trust deposits. Id. at 163, 59 S.Ct. 777. In connection with this action, she sought attorney's fees and costs.
The Supreme Court awarded the plaintiff her fees and costs. It recognized that where a plaintiff traced or created a common fund for the benefit of others, as well as himself, he was entitled to attorney's fees upon prevailing in the suit. Id. at 169, 59 S.Ct. 777. The stare decisis effect of Sprague established as a matter of law the right of the other 14 trusts to collect fees upon their similar common-fund claims, and the case paved the way for the exception to apply in other common-fund cases. Id. at 163, 59 S.Ct. 777; see also Matter of Colt Indus. Shareholder Litigation, 77 N.Y.2d 185, 565 N.Y.S.2d 755, 566 N.E.2d 1160 (1991)(recognizing exception to American Rule in common-fund situation); Whitney v. Citibank, N.A., 782 F.2d 1106 (2d Cir.1986)(recognizing exception and awarding plaintiff partial attorney's fees incurred while acting on behalf of and for the benefit of the partnership).
Beasley, however, unlike the plaintiffs in the above cases, did not sue for the benefit of the firm or to create a common fund, but only to seek redress for the wrongs inflicted upon him. The unjust enrichment rationale underlying Sprague's exception, thus, does not apply, especially given that the legislature enacted specific remedies to cover Beasley's claims. See Fleischmann, 386 U.S. at 720, 87 S.Ct. 1404. As such, we reverse.
Moreover, we reverse the award of costs. Under New York law, these costs, including expert witness fees, are not recoverable absent statutory authorization. See Zajic v. Zajic, 262 A.D. 765, 27 N.Y.S.2d 633 (1941), aff'd, 288 N.Y. 553, 42 N.E.2d 15 (1942); Lever Bros. Co. v. J. Eavenson & Sons, 261 A.D. 584, 26 N.Y.S.2d 649 (1941), aff'd, 288 N.Y. 627, 42 N.E.2d 620 (1942). Since New York is contrary to Florida law on this issue, cf. Murphy v. Tallardy, 422 So.2d 1098 (Fla. 4th DCA 1982), and since the parties stipulated that New York law governs, we find the award of these fees was erroneous.

VI. WHETHER CW & T HAD VALUABLE GOODWILL
Beasley argues on cross-appeal that the trial court's acceptance of CW & T's expert's "junk accounting" caused it to wrongfully find the firm had no valuable goodwill. We disagree, as there is competent, substantial evidence in the record to support Judge Cook's finding. Beasley's assertions that the court was "hoodwinked" simply is not supported by the evidence.
*260 AFFIRMED in part; REVERSED in part and REMANDED for further proceedings in accordance with this opinion.
STEVENSON and SHAHOOD, JJ., concur.
NOTES
[1] Paragraph F(4) of the agreement provided for expulsion where a partner experienced sudden and total disability, a provision not implicated in this case.
[2] We find that § 73 incorporates by reference § 72.6, which applies to the case of the expulsion of a partner. See Raymond v. Brimberg, 99 A.D.2d 988, 473 N.Y.S.2d 437 (1984), appeal dismissed, 64 N.Y.2d 775 (1985).
[3] The final judgment clearly shows Judge Cook's determination of the relative equities of the parties' positions when he found, "If Beasley has dirt under his fingernails, CW & T was up to its' (sic) elbows in the dung heap."