Joseph V. SAVINO and Ernestine Savino, Plaintiffs,

v.

The CITY OF NEW YORK, Kyle Raymond Sturcken, Michael Gargan, Raymond Dowd, David Bartholomew, John Baner, Sharon Brooks, Jose Perez, Howard Wilson and John Does 1 through 3, Defendants.

No. 97 CIV. 9029(MGC).

United States District Court, S.D. New York.

Oct. 30, 2001.

Doniger & Engstrand by D. Daniel Engstrand, New York City, for Plaintiffs.

Michael D. Hess, Corporation Counsel of the City of New York by Laura Corvo, Naomi Sheiner, Orrit Hershkovitz, New York City, for Defendants The City of New York, Kyle Sturcken, Michael Gargan, Raymond Dowd, David Bartholomew, John Baner, Sharon Brooks, Jose Perez and Howard Wilson.

*OPINION*

CEDARBAUM, District Judge.

Plaintiff Joseph Savino, a former medico-legal investigator in the New York City Office of the Chief Medical Examiner, sues the City of New York and several members of the New York Department of Investigation ("DOI") and the New York Police Department, asserting claims for (1) violation of his civil rights under 42 U.S.C. § 1983, (2) false arrest, malicious prosecution, abuse of process, defamation, and negligence under state law and (3) violations of the New York Constitution.[1] Plaintiff Ernestine Savino, wife of Joseph Savino, asserts a claim for loss of services and society. All claims arise from the criminal prosecution and subsequent acquittal of Joseph Savino for the theft of a ring from a death scene. Defendants have moved for summary judgment. For the following reasons, that motion is granted in part and denied in part.

## BACKGROUND

In February of 1995, plaintiff Joseph Savino was working as a medico-legal investigator ("MLI") at the Office of the Chief Medical Examiner for the City of New York ("OCME"). In late 1994, Savino had been widely described in the New York news media as the highest paid City employee based on his overtime earnings, and was dubbed the "King of Overtime." OCME policies also allowed other MLI's to earn large amounts of overtime. In fact, the top six overtime earners in the City in 1994 were MLI's. Newly elected Mayor Rudolph Giuliani took steps to reduce what was considered to be excessive overtime. He issued a policy directive to

---

1. Plaintiff continues to allege a deprivation of property under the Fourteenth Amendment as a result of a 30 day administrative suspension without pay following his arrest, despite my preclusion of that claim from this action. To the extent that it has remained in the case, that claim is now dismissed.

the Office of Management and Budget to track overtime costs at every City agency and report the findings to him on a monthly basis. Defendant Howard Wilson, Commissioner of the DOI, spent considerable time over the course of two years beginning in the fall of 1994 on the issue of excessive overtime at OCME. Defendant Kyle Sturcken, who was employed by the DOI as Inspector General of the Department of Health, investigated and prepared a report on overtime earnings by MLI's at OCME. Following the investigation, it was determined that plaintiff's overtime earnings were lawful and in accordance with OCME regulations. Savino continued to accrue extremely large amounts of overtime throughout 1995, and in September of 1995 he was again reported by the media to be the highest paid City employee.

At approximately 4:00 PM on February 12, 1995, Police Officers Raymond Dowd and Michael Gargan arrived at Room 4254 of the Marriott Marquis Hotel in Manhattan, which was the scene of an apparent suicide. Defendant Sergeant Sharon Brooks arrived a short time later. According to Gargan and Dowd, they searched the decedent's pocketbook and wallet and discovered some cash and a gold ring inset with five clear stones in a zippered pocket of the wallet. Dowd testified that he returned the ring to the pocket of the wallet. Gargan testified before the Grand Jury that he observed Dowd return the ring to the wallet. However, Gargan wrote in his contemporaneous notes that Dowd had informed him that he returned the ring. No other officer observed the ring in the wallet.

Detectives John Baner and David Bartholomew arrived at the scene at approximately 4:30 PM. The officers had noticed three prescription pill bottles in Room 4254. The pill bottles were ordinary prescription bottles made of orange plastic with prescription labels covering most of the outside surface. Bartholomew says that he looked at the pill bottles and did not recall seeing a ring inside. He did not, however, pick up the bottles or open them to examine their contents. The detectives also read a suicide note left by the decedent, in which she stated that she had placed a gold ring in her wallet that she wanted her sister to have.

Savino arrived at the death scene at approximately 5:30 PM. Sturcken and defendant José Perez, a DOI investigator, say that Savino told them that he had searched the decedent's wallet for identification, but Savino denies it. According to the police, the officers left Savino alone in the room with the decedent and her effects for approximately five minutes while he took pictures. Savino denies being in the room alone. In any event, Brooks testified that she watched Savino through the doorway and could also see the decedent's pocketbook, which had the wallet and ring inside. She did not see Savino approach the pocketbook or remove the ring from the wallet during the five minutes that he was allegedly alone in the room. After Savino completed his investigation, he took possession of the pill bottles, a common practice of MLI's, and left the scene.

While vouchering the decedent's property after Savino had left the scene, Gargan and Dowd discovered that the ring was missing. After an unsuccessful search for the ring, the officers called Baner and Bartholomew to find out if they had taken the ring. Neither Baner nor Bartholomew had taken the ring, and both returned to the death scene to help look for it. After also failing to find the ring, Bartholomew telephoned OCME at approximately 11:00 PM to speak to Savino. The woman with whom Bartholomew spoke said that Savino was not there, and that she would page him and ask him to call the hotel room.

At approximately 11:15, Savino returned Bartholomew's call from his home in Tarrytown and spoke with Baner. Baner told Savino that they were having trouble with some "property" at the scene. Savino replied that he had a ring, which he had found in one of the pill bottles he took from the scene. They agreed that Savino's brother, Lawrence, who was also an MLI, would bring the ring to the police station that night.

Savino prepared an Investigator's Report and a Supplemental Case Information ("SCI") form relating to the investigation of the death scene. On the SCI form, Savino stated that he had found "a yellow ring with five white stones" in one of the pill bottles he had removed from the scene. The Investigator's Report was faxed to OCME at 12:20 AM and the SCI form at 7:38 AM on February 13. Savino states that he tried to fax the forms sooner, but the OCME's line was busy.

The Police Department filed a complaint with the DOI on February 28, 1995 alleging that Savino had stolen the ring from the death scene. Prior to that report, the DOI had received other reports about property missing from death scenes. Defendant Sturcken opened a new investigation into the criminal allegations against Savino. By the end of March 1995, Sturcken, with the assistance of Perez, had interviewed all of the officers and detectives who had been present at the death scene, and informed Wilson of their findings. On September 26, 1995, two weeks after Savino's overtime earnings for the year were reported in the New York Post, Sturcken met with Assistant District Attorney ("ADA") Joseph Sullivan and his supervisor, ADA William Burmeister about the Savino case. ADA Sullivan re-interviewed all of the police witnesses. Sullivan's affidavit does not indicate whether he was informed that Brooks had

observed Savino while he was alone in the room, and had seen that he did not take the ring. During the investigation, Sullivan decided that Savino had taken the ring and submitted a false SCI form in which he claimed to have found the ring inside a pill bottle. In early 1996, various unsuccessful sting operations were attempted to catch Savino in the act of stealing from a death scene. It appears from Wilson's deposition that, in late June of 1996, he contacted the District Attorney's office to encourage them to approve the arrest of Savino before the end of the fiscal year, although Wilson denies influencing the outcome of the investigation or the decision to arrest Savino.

On June 26, 1996, Savino was arrested without a warrant by the DOI in Sturcken's office, and charged with (1) Petit Larceny, in violation of New York Penal Law § 155.25, (2) Falsifying Business Records in the First Degree, in violation of New York Penal Law § 175.10, (3) Offering a False Instrument in the First Degree, in violation of New York Penal Law § 175.35, and (4) Official Misconduct, in violation of New York Penal Law § 195.00. He was held in custody until the following day. On that day, the DOI issued a press release, edited by Commissioner Wilson, announcing Savino's arrest. The press release referred to the fact that Savino had been reported as the City's highest overtime earner. As a result of the arrest, Savino was suspended by OCME for 30 days without pay.

In September 1996, Savino was indicted by a Grand Jury for all four crimes with which he was charged and, in addition, for the crime of Tampering with Public Records in the First Degree, in violation of New York Penal Law § 175.25. All of the police witnesses except Brooks testified before the Grand Jury, as did defendant Sturcken. On January 27, 1997, after ap-

proximately 17 minutes of deliberation, a trial jury acquitted Savino of all criminal charges.

## DISCUSSION

### Standard For Summary Judgment

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The judge's role in summary judgment "is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In deciding whether a genuine issue exists, a court must "examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party." *In re Chateaugay Corp.,* 10 F.3d 944, 957 (2d Cir.1993). Nonetheless, "Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

### False Arrest and Malicious Prosecution

 Plaintiff asserts claims for false arrest and malicious prosecution under 42 U.S.C. § 1983 and New York law. A § 1983 claim arises when a person acting under color of state law deprives the plaintiff of a right, privilege or immunity secured by the Constitution or laws of the United States. Falsely arresting or maliciously prosecuting an individual without probable cause constitutes a deprivation of liberty without due process of law in violation of the Fourth and Fourteenth Amendments to the Constitution. *See Cook v. Sheldon,* 41 F.3d 73, 77–79 (2d Cir.1994). Because courts look to the applicable state law to determine the elements of § 1983 claims for false arrest and malicious prosecution, the same elements are required for both the federal and the state claims asserted. Accordingly, in this case these claims are analyzed together. *See id.* at 79; *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996).

 To state a claim for false arrest or imprisonment under New York law, a plaintiff must prove (1) that the defendants intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged. *Bernard v. United States,* 25 F.3d 98, 102 (2d Cir. 1994). It is not disputed that plaintiff was arrested and held overnight without his consent.

 A defendant is liable for false imprisonment even if he did not physically detain the plaintiff, if it can be shown that he "affirmatively instigated or procured [the] arrest." *King v. Crossland Savings Bank,* 111 F.3d 251, 256–57 (2d Cir.1997). However, a defendant must do more than "merely provide information to the police." *Id.* Defendants Sturcken and Perez arrested the plaintiff. In addition, plaintiff has presented evidence from which a jury could find that defendant Wilson, by calling the District Attorney's office to influence the District Attorney to make an arrest, "affirmatively instigated or procured" plaintiff's arrest. Plaintiff has not proffered evidence, however, that the police defendants intended that Savino be

arrested or confined. They supplied information about the events of February 12, but it was the Commanding Officer of the Internal Affairs Division who submitted the complaint to the DOI. Accordingly, summary judgment is granted to the police defendants on the false arrest claim.

■ The elements of a claim for malicious prosecution under New York law are (1) the initiation of a proceeding, (2) the termination of the proceeding in the plaintiff's favor, (3) the lack of probable cause, and (4) malice. *Colon v. City of New York,* 60 N.Y.2d 78, 82, 468 N.Y.S.2d 453, 455 N.E.2d 1248 (N.Y.1983). Only the latter two elements are at issue.

■ Just as the lack of probable cause is an essential element of a claim for malicious prosecution, *id.,* "[t]he existence of probable cause constitutes justification and is a complete defense to a claim of false arrest, whether the action is brought under state law or under § 1983." *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir. 1996). "Probable cause consists of such facts and circumstances as would lead a reasonably prudent person in like circumstances to believe plaintiff guilty." *Colon,* 60 N.Y.2d at 82, 468 N.Y.S.2d 453, 455 N.E.2d 1248.

■ Indictment before a grand jury creates a presumption of probable cause. *Weyant,* 101 F.3d at 852 (false arrest); *Colon,* 60 N.Y.2d at 82, 468 N.Y.S.2d 453, 455 N.E.2d 1248 (malicious prosecution). That presumption may only be rebutted by evidence that the indictment was procured by "fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Id.* Defendant Brooks testified at plaintiff's criminal trial that she could see both plaintiff and the decedent's pocketbook while plaintiff was allegedly alone in the hotel room, and that plaintiff did not remove the ring from the pocketbook at that time. This exculpatory evidence, however, was not presented to the grand jury. In the absence of that evidence, the testimony of Gargan and Dowd that plaintiff was alone in the room, and had the opportunity to steal the ring at that time, was misleading. It is unclear from the record whether the police defendants disclosed Brooks' information to the ADA or the DOI. If they did not, the failure to do so would be sufficient evidence of bad faith to rebut the presumption created by the indictment with respect to them.

In the absence of the presumption, there are genuine issues of fact with respect to both probable cause and qualified immunity. Either Savino removed the ring from the wallet, intending to steal it, or the ring was in one of the pill bottles when he took possession of them. If the latter is true, then the testimony of the police defendants in the grand jury—i.e. that the ring was not in the pill bottle but was placed in the wallet—was false. The issue is purely one of witness credibility, which must be left to the wisdom of the jury. Moreover, the police did not witness plaintiff remove the ring from the wallet when they were in the room with him. Additionally, since Brooks observed that plaintiff did not remove the ring while alone in the room, it is not clear how he could have taken possession of the ring unless it was in one of the pill bottles. Given these facts, a reasonable jury could find that there was no probable cause to believe that plaintiff took the ring with the intent to steal it.

The record is also unclear as to whether Sturcken, Perez and Wilson knew about Brooks' evidence. However, Sturcken and Perez were actively involved in the investigation, and "where law enforcement authorities are cooperating in an investigation ... the knowledge of one is presumed shared by all." *Illinois v. Andreas,* 463

U.S. 765, 772 n. 5, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983); *see also United States v. Cruz*, 834 F.2d 47, 51 (2d Cir. 1987). They, in turn, informed Wilson of their findings. Since on a motion for summary judgment all inferences must be drawn in favor of the non-moving party, I must assume that Wilson was also aware of what Brooks witnessed. Since all three allowed her testimony to be excluded from the grand jury, they are not entitled to a presumption of probable cause created by the indictment. As discussed above, without the presumption, there are genuine issues of fact with respect to probable cause and qualified immunity that the jury must resolve at trial.

### Malicious Abuse of Process

 "In New York, a malicious abuse of process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse of justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Cook*, 41 F.3d at 80. Malicious abuse of criminal process also supports liability under § 1983. *Id.* Here, plaintiff was arrested, indicted and made to stand trial. *See id.* (arrest and arraignment of plaintiff for collateral purpose supported abuse of process claim). Plaintiff also alleges a collateral purpose for his prosecution—to prevent embarrassment to the City from media reports of plaintiff's huge overtime earnings. A reasonable jury could infer from the timing of defendants' actions that the overtime issue was the motivating factor in the prosecution. Further, although abuse of process, unlike malicious prosecution, does not require that probable cause be lacking, *McMullen v. Michigan Home Furnishing Corp.*, 132 Misc. 838, 230 N.Y.S. 508, 509–10 (1928); *see also* 86 N.Y.Jur.2d, § 134, at 381, a lack of proba-ble cause creates an inference of malice, supporting the collateral objective element. As discussed above, plaintiff has raised genuine issues of fact with respect to probable cause.

### Remaining State Claims

Plaintiff also asserts claims for defamation, intentional infliction of emotional distress, negligence and violations of the New York State Constitution. Summary judgment is granted as to each of those claims.

 Plaintiff alleges that the City and the DOI defamed him by issuing the June 27, 1996 press release, which announced that he had been arrested and charged with the theft of the ring. It is undisputed that plaintiff was arrested and charged, and, therefore, he cannot prove the falsity of the statement. *See Prozeralik v. Capital Cities*, 82 N.Y.2d 466, 473, 605 N.Y.S.2d 218, 626 N.E.2d 34 (N.Y.1993)("a plaintiff in a defamation action has the burden of showing the falsity of the factual assertions").

 Plaintiff's claim for intentional infliction of emotional distress is without merit. Under New York law, "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress." *Fischer v. Maloney*, 43 N.Y.2d 553, 557, 402 N.Y.S.2d 991, 373 N.E.2d 1215 (N.Y. 1978) (*quoting* Restatement (Second) of Torts § 46(1) (1965)). In addition, New York courts have required that the conduct in question be "especially calculated to cause" harm. *See Green v. Leibowitz*, 118 A.D.2d 756, 500 N.Y.S.2d 146, 148 (2d Dep't 1986). If a defendant's primary purpose was to advance some other interest and the harm to the plaintiff was incidental, then liability for intentional infliction of emotional distress does not attach. *See Rooney v. Witco Corp.*, 722 F.Supp.

1040, 1045 (S.D.N.Y.1989) (*citing O'Rourke v. Pawling Savings Bank*, 80 A.D.2d 847, 444 N.Y.S.2d 471, 472 (2d Dep't 1981)). Plaintiff, himself, argues that defendants actions were intended to prevent embarrassment to the city from reports of plaintiff's overtime earnings. Analyzing the facts in the light most favorable to the plaintiff, no reasonable jury could find that defendants' conduct was designed only to cause harm to plaintiff.

Plaintiff's negligence claim also fails as a matter of law. "Under New York law, a plaintiff may not recover under general negligence principles for a claim that law enforcement officers failed to exercise the appropriate degree of care in effecting an arrest or initiating a prosecution." *Bernard*, 25 F.3d at 102 (*citing Boose v. Rochester*, 71 A.D.2d 59, 421 N.Y.S.2d 740, 744 (4th Dept.1979)).

Plaintiff also alleges violations of Sections 6 and 12 of Article I of the New York State Constitution. The New York Constitution, however, does not provide a private right of action for claims that are remediable under 42 U.S.C. § 1983 or other state laws. *Remley v. State*, 174 Misc.2d 523, 665 N.Y.S.2d 1005, 1008–1009 (1997); *Coakley v. Jaffe*, 49 F.Supp.2d 615, 628–29 (S.D.N.Y.1999). Since any violations of Sections 6 and 12 would be actionable under § 1983, the state constitutional claims must be dismissed.

### Municipal Liability

A municipality can found liable under § 1983 only where the violation of constitutional rights resulted from a municipal policy or custom. *Monell v. Department of Social Services*, 436 U.S. 658, 690–92, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The burden is on the plaintiff to establish the existence of a policy or custom as the basis for municipal liability. *See Vippolis v. Village of Haverstraw*, 768

F.2d 40, 44 (2d Cir.1985). Plaintiff argues that he was arrested and prosecuted pursuant to the City's formal policy to reduce excessive overtime. There is no evidence, however, that the formal policy included or provided for prosecution of large overtime earners without probable cause. Accordingly, the essential causal link between the formal policy and the alleged violation of plaintiff's constitutional rights is absent. *See City of Canton v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) ("[O]ur first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.").

However, plaintiff also presents evidence that Wilson, the Commissioner of DOI, was involved in the investigation and influenced the District Attorney's office to authorize plaintiff's arrest. Plaintiff argues that a jury could infer that the DOI, through Wilson, Sturcken and Perez, pursued the criminal investigation against plaintiff to stop plaintiff from earning overtime. As Commissioner of the DOI, Wilson has broad powers "to make any study or investigation which in his opinion may be in the best interests of the city, including but not limited to investigations of the affairs, functions, accounts, methods, personnel or efficiency of any agency." N.Y. Chart. § 803(b). His jurisdiction extends "to any officer [or] employee of the city." *Id.* at § 803(d). With respect to investigations of wrongdoing or corruption by City employees, it would appear that he is the final policy making authority, and his actions represent official policy. *See, e.g., Jeffes v. Barnes*, 208 F.3d 49 (2d Cir.2000). Whether his conduct caused the alleged deprivations of plaintiff's right is an issue of fact for the jury. *Id.* at 61. However, since the parties have not directly addressed the issue of whether the Commissioner of the DOI is a final policy-

making authority, I reserve decision pending further briefing.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted in part and denied in part. Summary judgment is granted to all defendants on the claims of defamation, negligence, intentional infliction of emotional distress, and violation of the New York Constitution. Summary judgment is also granted to defendants Gargan, Dowd, Brooks, Bartholomew and Baner only with respect to the claims of false arrest.

Decision is reserved with respect to plaintiff's claims against the City of New York under 42 U.S.C. § 1983, and the parties are directed to deliver to chambers, no later than November 15, 2001, memoranda on the issue of whether the Commissioner of the DOI, Howard Wilson, is a final policy making authority such that his actions may subject the City to liability under § 1983. The motion is denied with respect to all other claims.

SO ORDERED.