[912 NE2d 26, 884 NYS2d 194]

DAVID A. KIPPER, M.D., Appellant, et al., Plaintiff, v NYP HOLD-
INGS CO., INC., Doing Business as THE NEW YORK POST, Re-
spondent.

Argued March 24, 2009; decided April 30, 2009

**POINTS OF COUNSEL**

*Jaroslawicz & Jaros, LLC,* New York City (*David Jaroslawicz, Robert J. Tolchin* and *Elizabeth Eilender* of counsel), for appellant. I. The Appellate Division erroneously ignored defendant's reckless disregard for the truth. (*Wilsey v Saratoga Harness Racing,* 140 AD2d 857; *McGovern v Hayes,* 135 AD2d 125; *New York Times Co. v Sullivan,* 376 US 254; *Freeman v Johnston,* 84 NY2d 52; *Rivera v Time Warner Inc.,* 56 AD3d 298; *Gertz v Robert Welch, Inc.,* 418 US 323.) II. Plaintiff is not

a public figure. (*Merritt Hill Vineyards v Windy Hgts. Vineyard,* 61 NY2d 106; *Dunham v Hilco Constr. Co.,* 89 NY2d 425; *Cover v Cohen,* 61 NY2d 261; *New York Times Co. v Sullivan,* 376 US 254; *Waldbaum v Fairchild Publs., Inc.,* 627 F2d 1287, 449 US 898; *Gertz v Robert Welch, Inc.,* 418 US 323; *Horowitz v Mannoia,* 10 Misc 3d 467; *Park v Capital Cities Communications,* 181 AD2d 192; *James v Gannett Co.,* 40 NY2d 415; *Time, Inc. v Firestone,* 424 US 448.)

*Hogan & Hartson LLP,* New York City (*Slade R. Metcalf, Katherine M. Bolger* and *Rachel F. Strom* of counsel), for respondent. I. This Court should review the order below in accordance with this Court's long-held tradition of protecting the rights of the press. (*Bose Corp. v Consumers Union of United States Inc.,* 466 US 485, 467 US 1267; *Immuno AG. v Moor-Jankowski,* 77 NY2d 235, 500 US 954; *Freeman v Johnston,* 84 NY2d 52, 513 US 1016; *Sweeney v Prisoners' Legal Servs. of N.Y.,* 84 NY2d 786; *Mahoney v Adirondack Publ. Co.,* 71 NY2d 31.) II. This Court should affirm the First Department's decision because David Kipper has not produced any evidence of constitutional malice. (*New York Times Co. v Sullivan,* 376 US 254; *Curtis Publishing Co. v Butts,* 388 US 130; *Gertz v Robert Welch, Inc.,* 418 US 323; *Anderson v Liberty Lobby, Inc.,* 477 US 242; *Secord v Cockburn,* 747 F Supp 779; *Freeman v Johnston,* 84 NY2d 52; *Roche v Hearst Corp.,* 53 NY2d 767; *Sprewell v NYP Holdings, Inc.,* 43 AD3d 16; *Karaduman v Newsday, Inc.,* 51 NY2d 531; *Washington Post Co. v Keogh,* 365 F2d 965, 385 US 1011.) III. The question of whether David Kipper is a public figure is not properly before this Court. (*Quain v Buzzetta Constr. Corp.,* 69 NY2d 376.) IV. David Kipper is "unquestionably a public figure." (*Horowitz v Mannoia,* 10 Misc 3d 467; *James v Gannett Co.,* 40 NY2d 415; *Maule v NYM Corp.,* 76 AD2d 58, 54 NY2d 880; *Immuno AG. v Moor-Jankowski,* 77 NY2d 235; *Wilsey v Saratoga Harness Racing,* 140 AD2d 857; *Kelly v State of New York,* 131 AD2d 176; *Thomas v Los Angeles Times Communications, LLC,* 189 F Supp 2d 1005; *Chapadeau v Utica Observer-Dispatch,* 38 NY2d 196; *Lopez v Univision Communications, Inc.,* 45 F Supp 2d 348; *Meeropol v Nizer,* 560 F2d 1061.)

**OPINION OF THE COURT**

CIPARICK, J.

In this appeal, we must determine whether the summary judgment record contains clear and convincing evidence that defendant published a false and defamatory statement concerning

the revocation of plaintiff's medical license with "actual malice," as defined in *New York Times Co. v Sullivan* (376 US 254 [1964]). Because it does not, we affirm the Appellate Division's grant of summary judgment to defendant.

I.

On December 7, 2003, page 24 of the New York Post's Sunday edition carried a short, eight-paragraph, "rewrite" of a 98-paragraph article taken from the Los Angeles Times's wire service. The Times article, entitled "Harsh Reality of 'Osbournes' No Laughing Matter," described the rock singer John "Ozzy" Osbourne's allegations that his former physician, plaintiff David A. Kipper, had overprescribed various medications to him during the time that Osbourne starred in a television reality series.[1] In addition, the Times article accurately stated that the California Medical Board had "moved to revoke" plaintiff's license due to his alleged gross negligence in the treatment of other patients. But the Post article, which appeared under the inaccurate headline "Ozzy's Rx doc's License Pulled," contained an error. Despite clearly indicating that it was based upon "Los Angeles Times reports," the sixth paragraph of the Post rewrite incorrectly stated that "the state medical board revoked Kipper's license."

The circumstances surrounding the Post's erroneous statement are not entirely clear. The record reveals that, sometime during the evening of December 6, a Post editor assigned the task of rewriting the wire service story to a then-part-time reporter, Lyle Hasani Gittens. According to Gittens, the Post rewrite was slated to appear in the second edition of the paper, the usual deadline for which was "around 8:00 to 9 o'clock." Gittens swore in an affidavit and testified at his deposition that he did not recall writing and did not think he wrote that plaintiff's license was revoked, a statement that defendant concedes was both false and defamatory. He speculated that the error might have occurred during the editing process.

After Gittens prepared the rewrite on a personal computer, he transmitted it to an electronic "basket" where it was reviewed by an editor. Gittens was aware that editors sometimes altered the text of articles and, as typical of such editing, he cited stylistic changes to an article's lead, or first, paragraph. But he

---

1. Because Supreme Court dismissed claims brought on behalf of Dr. Kipper's professional corporation, all references to "plaintiff" herein are to Kipper in his individual capacity.

denied having any knowledge that Post editors deliberately changed the facts of stories.

The record sheds no light on the actual editing of Gittens's rewrite. The editor responsible for it, Todd Venezia, testified that he would "never deliberately" falsify information pertaining to a doctor's licensure, but he could not offer any specific details pertaining to his review of the December 7 rewrite. Moreover, the record does not contain the original draft that Gittens submitted to Venezia.[2]

An affidavit submitted by the Post's metropolitan editor, Jesse Angelo, does, however, set forth the path that a rewrite generally travels after editorial review. At that point, it is sent to the copy desk for additional checking of grammar, punctuation and accuracy as well as any reduction in text necessary to fit the paper's layout requirements. The copy desk is also responsible for preparing headlines before the article is processed by the production department for page-setting and transmission to the printer. How these steps were accomplished prior to publication of the "Ozzy" rewrite is not revealed by the record.

Apparently, the sole source material for Gittens's rewrite was the Los Angeles Times wire service story. Gittens testified that he did "not recall" making any independent effort to verify the status of plaintiff's license prior to publication of the Post article. Additionally, Gittens remarked that Post editors would "[n]ot necessarily" engage in additional fact-checking after an article's submission unless "something very conspicuous . . . leap[t] out" at them. Accepting the substance of a wire service story was not unusual, according to Angelo. He averred that the Post occasionally reprints stories disseminated on reputable wire services, such as that of the Los Angeles Times, verbatim and that additional research regarding the factual accuracy of such stories is not generally undertaken. With respect to the Los Angeles Times wire service dispatch relevant here, Angelo stated that "this is not the kind of story that [the Post] would have expected a reporter to do additional research [on]."

Nonetheless, Angelo explained that a reporter performing a rewrite may make "minor editorial changes," including "more interesting word selection," before publication in the Post. During his deposition, Gittens provided additional details about the rewriting process, stating that it essentially entailed shortening

---

**2.** At his deposition, Gittens stated that the original draft might have been "purged" from one of the Post's electronic file directories.

the length of a wire service dispatch and changing its "lead" paragraph "to make it more Post-like," by which he meant "less boring than the Los Angeles Times" or "[a] better read." The lead paragraph in the rewrite of which plaintiff complains, however, correctly stated that plaintiff was "under investigation for over-prescribing drugs."

On January 30, 2004—nearly two months after it was published—counsel for plaintiff wrote to the Post asserting that the December 7 rewrite was false and defamatory and "published with reckless disregard for the truth." The letter demanded a retraction within 14 days. The Post complied, publishing a "Correction" on page 26 of its February 9 edition, which stated that the state Medical Board had "moved to revoke [plaintiff's] license, although no action has as yet been taken." Plaintiff then commenced this libel suit on November 23, 2004, almost a year after the Post rewrite was first published and more than nine months after publication of the requested retraction.

Following discovery, defendant moved for summary judgment. As relevant here, Supreme Court denied the motion (15 Misc 3d 1136[A], 2007 NY Slip Op 51005[U]), reasoning that defendant bore the burden of demonstrating that its misstatement regarding the status of plaintiff's license was not published with actual malice as defined by *New York Times*—i.e., with knowledge of falsity or a reckless disregard for the truth.[3] A unanimous Appellate Division reversed, granting defendant summary judgment and dismissing the complaint (*see* 47 AD3d 597, 598 [1st Dept 2008]). We granted leave to appeal (11 NY3d 704 [2008]) and now affirm.

II.

As set forth in *New York Times Co. v Sullivan* (376 US 254 [1964]) and its progeny, the US Constitution's First Amendment bars a public figure from recovering damages in a libel action unless clear and convincing evidence proves that a false and defamatory statement was published with " 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not" (*id.* at 279-280,

---

**3.** The actual malice standard applies here because, as Supreme Court held, plaintiff is "unquestionably a public figure" (2007 NY Slip Op 51005[U] at *2) due to the extensive media coverage of his detoxification practice, his more than 100 television appearances as a medical expert, and his roles as a doctor in several films (*see James v Gannett Co.*, 40 NY2d 415, 422 [1976]).

285-286; *Masson v New Yorker Magazine, Inc.*, 501 US 496, 511 [1991]; *Harte-Hanks Communications, Inc. v Connaughton*, 491 US 657, 666-667 [1989]; *Bose Corp. v Consumers Union of United States, Inc.*, 466 US 485, 511 [1984]). The clear and convincing evidence standard is applicable to a trial court's assessment of a libel defendant's motion for summary judgment (*see Anderson v Liberty Lobby, Inc.*, 477 US 242, 252 [1986]; *see also Freeman v Johnston*, 84 NY2d 52, 57 [1994]). In such a posture, the question is "whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not" (*Anderson*, 477 US at 255-256).

Thus, a libel defendant's burden in support of summary judgment is not, as Supreme Court reasoned, to prove as a matter of law that it did not publish with actual malice, but to point to deficiencies in the record that will prevent plaintiff from proving that fact by clear and convincing evidence (*cf. Roche v Hearst Corp.*, 53 NY2d 767, 769 [1981]; *Millus v Newsday, Inc.*, 89 NY2d 840, 843 [1996]). On appeal, our task is to undertake an independent review to determine whether the record evidence is capable of demonstrating actual malice with "convincing clarity" (*see Freeman*, 84 NY2d at 57). We turn then to plaintiff's argument that the record contains evidence sufficient for a reasonable jury to find that the Post published the erroneous statements regarding his license with reckless disregard for the truth.

Although incapable of "one infallible definition . . . reckless conduct is not measured by whether a reasonably prudent [person] would have published, or would have investigated before publishing" (*see St. Amant v Thompson*, 390 US 727, 730-731 [1968]). Instead, to cross the constitutional threshold of actual malice, there must be "clear and convincing evidence . . . that the author in fact entertained serious doubts as to the truth of his publication or acted with a high degree of awareness of . . . probable falsity" (*see Masson*, 501 US at 510 [citations and internal quotation marks omitted]).[4] The inquiry is thus a subjective one, focusing upon the state of mind of the publisher of the allegedly libelous statements at the time of

---

4. The sort of actual malice required under *New York Times* "should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will" (*see Masson*, 501 US at 510). While such motivations are not irrelevant to the actual malice inquiry (*see* 2 Smolla and Nimmer On Freedom of Speech § 23:3, at 23-17 [2008] [hereinafter Smolla and Nimmer]),

publication (*see Bose Corp.*, 466 US at 511 n 30; *Harte-Hanks*, 491 US at 689).[5] This decidedly high standard of culpability has been set because "it is essential that the First Amendment protect some erroneous publications as well as true ones" (*see St. Amant*, 390 US at 732). The actual malice standard recognizes that falsehoods relating to public figures are "inevitable in free debate" and that publishers must have sufficient "breathing space" (*see Hustler Magazine, Inc. v Falwell*, 485 US 46, 52 [1988]) so that the First Amendment's commitment to "the principle that debate on public issues should be uninhibited, robust, and wide-open" will be realized (*see New York Times*, 376 US at 270).

■ We agree with the Appellate Division that the present record lacks the clear and convincing evidence necessary for a jury to conclude that defendant's inaccurate statements were published with actual malice. As an initial matter, plaintiff's reliance upon the Post's failure to employ fact-checkers, to attempt to verify the status of his license prior to publication, or to identify those individuals responsible for the false headline and statement is misplaced. Put simply, such proof of "[m]ere negligence does not suffice" to establish actual malice by clear and convincing evidence (*see Masson*, 501 US at 510). Conceivably, in an extreme case, a failure to investigate could be so gross as to prove a willful avoidance of knowledge (*cf. Harte-Hanks*, 491 US at 690-693), but this is not that case.

---

there is no evidence in this record that defendant was motivated by an intent to injure plaintiff.

5. The dissent does not quarrel with this point (*see* dissenting op at 362). Nor could it (*see* 2 Smolla and Nimmer § 23:3, at 23-15 [noting that the U.S. Supreme Court has "repeatedly emphasized the subjective nature of the actual malice standard"]). Recognizing the rule that the actual malice inquiry necessarily entails consideration of a defendant's subjective mental state does not, however, inevitably place the outcome of a libel case within a defendant's "unilateral control" (*see* dissenting op at 363 [internal quotation marks omitted]). That result would only obtain if a libel defendant's mere assertion of good faith publication, despite clear and convincing circumstantial evidence of actual malice, would suffice to permit summary judgment. As the dissent correctly points out, this Court has never sanctioned such a rigid rule (*see Prozeralik v Capital Cities Communications*, 82 NY2d 466, 478 [1993]). And we do not do so here. Instead, we acknowledge that "mere protestations of good faith by a defendant do not preclude establishing actual malice through other inferential or circumstantial proof" (*see* Smolla and Nimmer § 23:3, at 23-18). But we conclude that the facts and circumstances adduced by plaintiff in this case could not clearly and convincingly prove actual malice to the satisfaction of a reasonable jury.

We are concerned here with whether there is "concrete" or "affirmative evidence" (*see Anderson*, 477 US at 256, 257) in the record that would allow a jury to conclude with "convincing clarity" (*see Freeman*, 84 NY2d at 56) whether the Post's employees actually entertained serious doubts about the truth of the rewrite's inaccurate headline and sentence or that they published those statements with a high degree of awareness of their falsity. Plaintiff argues that a jury applying the *New York Times* actual malice standard could find in his favor because the record establishes that a Post editor fabricated the facts concerning plaintiff's licensure to make Gittens's rewrite "more sensational[ ]" and thereby generate increased sales. Other than the fact that the rewrite contains two erroneous statements, however, there is no evidence that Gittens, his editor Venezia, or anyone else at the Post seriously doubted the truth of the complained-of statements or was highly aware that they were incorrect prior to publication. Evidence of falsity does not equate with proof of actual malice (*see Mahoney v Adirondack Publ. Co.*, 71 NY2d 31, 39-40 [1987]).

Given this lack of concrete proof, plaintiff relies heavily upon Gittens's testimony that the lead paragraph of a wire service article was usually edited to make it "more Post-like." But the full context of Gittens's testimony along with his affidavit, Angelo's affidavit, and Venezia's testimony, demonstrate that this shorthand phrase referred to stylistic alterations and not to the fabrication of facts. A writer can make an article a "better read" and engage in "more interesting word selection" without sacrificing factual integrity. Clearly, the First Amendment offers no shield to "calculated falsehoods" (*see Harte-Hanks*, 491 US at 687 n 34, quoting *Garrison v Louisiana*, 379 US 64, 75 [1964]; *Cantrell v Forest City Publishing Co.*, 419 US 245, 253 [1974]), but at no point does this record even suggest that the Post set out to falsely defame plaintiff in this instance, or other individuals regularly, to increase its sales.[6] Moreover, plaintiff's heavy reliance on the "more Post-like" testimony is flawed since Gittens's deposition indicates that he was using that jargon to refer to changes made to a rewrite's lead paragraph. Here, however, plaintiff does not contend that that paragraph is inaccurate.

---

6. In this connection, the U.S. Supreme Court has concluded that a defendant's profit motive in publishing allegedly false and defamatory material does not "suffice to prove actual malice" (*see Harte-Hanks*, 491 US at 667).

We recognize the danger of awarding summary judgment solely upon the defendant's professions of good faith in publishing libelous material (*see St. Amant*, 390 US at 731-732). But the U.S. Supreme Court has instructed that a plaintiff must be held to the burden of adducing clear and convincing evidence of actual malice at the summary judgment stage so long as there has been a "full opportunity to conduct discovery" (*see Anderson*, 477 US at 257). Here, there was such an opportunity. But this public figure plaintiff has come forward with nothing more than a mere hope that a jury would discredit the Post employees' testimony. This is insufficient (*see Anderson*, 477 US at 256-257, quoting *Bose Corp.*, 466 US at 512 ["discredited testimony is not normally considered a sufficient basis" for defeating a proper summary judgment motion (internal quotation marks and alteration omitted)]). As we stated in *Trails W. v Wolff* (32 NY2d 207 [1973]), it is "not enough" for a libel plaintiff resisting a motion for summary judgment to rely upon "[s]uspicion, surmise and accusation" (*see id.* at 221 [internal quotation marks omitted]).

Rather, as in *Prozeralik v Capital Cities Communications* (82 NY2d 466 [1993]), a plaintiff seeking jury resolution must point to facts and circumstances that could prove actual malice under the *New York Times* standard. In that case, there was evidence that a television and radio broadcaster's news employees had surmised that plaintiff was a victim of a beating and abduction possibly orchestrated by members of organized crime solely because he, like "countless" other individuals, was a restaurateur in the Niagara region (*see id.* at 475-476). This assumption was sheer "rootless speculation," lacking any "basis or source whatsoever" (*id.*). Although the defendant claimed to have verified the plaintiff's identity as the victim with a spokesperson for the Federal Bureau of Investigation prior to issuing broadcasts relaying that information to the public, the FBI's spokesperson denied having made any such confirmation (*id.*). Furthermore, the broadcasts occurred during a period when the defendant's stations were engaged in a ratings competition for advertising revenues and after a rival television station had already announced the name of the actual victim the night before the defendant's newscasts (*id.*). And although the defendant did broadcast a retraction after being made aware of its error, the retraction claimed that the FBI had previously confirmed the plaintiff's status as the victim even after the FBI spokesperson expressly told the broadcaster's news director that this had not

occurred (*id.*). In light of these facts and circumstances, we concluded that "[w]hile falsity alone and negligence alone would not be sufficient to sustain plaintiff's burden, there is enough in this case to submit the issue of actual malice to a jury for factual resolution" (*id.* at 476).

The same cannot be said here. First, the possible revocation of defendant's license was accurately mentioned in a lengthy Los Angeles Times wire service article. Thus, plaintiff's license controversy was not thrust into the public eye merely on defendant's whim. Second, there is no evidence that defendant's employees intentionally or recklessly fabricated the relevant false statements. Although the actual status of plaintiff's license could be verified through an accurate reading of the Times article, this potentiality does not negate the possibility that Gittens or his editors, all working under a deadline, simply misperceived the correct statement in the Times article or draft rewrite (*cf. Mahoney*, 71 NY2d at 40). Certainly, there is no evidence that any Post employee deliberately avoided consulting the Times article so as to publish a more sensational, albeit concocted, story with an untarnished mental state (*cf. Harte-Hanks*, 491 US at 690-693 [along with other circumstantial evidence, newspaper's failure to interview key witness or to listen to available tape recordings that would verify or refute account of newspaper's source constituted an actionable "purposeful avoidance of the truth" (*id.* at 692)]).[7]

---

7. According to the dissent, the Post's actions in this case are "more egregious" than those at issue in *Prozeralik* because there, although an accurate report was broadcast before defendant's erroneous one, a reporter disputed the FBI spokesperson's claim that the plaintiff's identity had not been confirmed before the defendant's inaccurate report was aired (*see* dissenting op at 363). But "a highly and significantly discrete feature" identified by this Court in refusing to dismiss for lack of the requisite proof of actual malice was that "plaintiff's name was initially injected randomly by defendant's own employees merely because he happened to be a Niagara restaurateur" (*see Prozeralik*, 82 NY2d at 477). Moreover, the FBI employee's testimony, "categorical[ly]" denying the purported confirmation, provided "[d]irect evidence" that would permit a jury to infer that the defendant " 'knew or suspected' " that its statement was false (*see id.* at 477). There is simply no indication in *Prozeralik* that the presence of an accurate news report, contradicting defendant's, would have been enough to permit jury resolution of the actual malice question. It was simply one factor that served to corroborate other record evidence that supported an inference of actual malice (*see id.* at 477-478).

Here, plaintiff's license controversy was a matter of public knowledge prior to publication of the Post rewrite. And there is not even circumstantial, let

Third, to the extent that plaintiff contends that the Post's editors were motivated to "spice . . . up" articles with invented facts in order to increase the newspaper's paid circulation, the December 7 rewrite would be a particularly poor vehicle for advancing that goal. The rewrite was inconspicuously placed on page 24 of the defendant's publication, where it appeared dwarfed in size by an adjacent, large-scale advertisement for home furnishings and was positioned above a blotter-style column entitled "Weird but true." In this context, it is highly unlikely that any member of the purchasing public would have chosen to buy the Post based on the complained-of rewrite. Even within the rewrite itself, the sentence relevant to plaintiff's licensure did not appear in the lead paragraph but was buried in the article's sixth of eight paragraphs. In fact, the lead paragraph correctly stated that plaintiff was "under investigation." Finally, unlike in *Prozeralik*, when plaintiff's counsel confronted the Post with the inaccuracy of its headline and sentence, the paper issued a full retraction within plaintiff's requested time frame.[8]

In sum, a reasonable jury confronted with these facts and circumstances could not find with convincing clarity that defendant's erroneous statements were published with actual malice. Rather, the record bespeaks nonactionable mistake or negligence.[9] Thus, a grant of summary judgment in defendant's favor was appropriate.

---

alone "direct," evidence which could clearly and convincingly establish that defendant's inaccurate rewrite was published with actual malice. The relevant evidence is simply that the Los Angeles Times article was correct, that—for some unexplained reason—defendant's rewrite was not, and that defendant usually makes certain stylistic edits in the course of preparing a rewritten wire service story for publication in its newspaper. This is not enough.

**8.** Unlike the retraction in *Prozeralik*, the Post's "Correction," which was located in a portion of the paper similar to that where the December 7 rewrite was placed, does not purport to be based on the Post's "independent investigation" (*compare* dissenting op at 361, *with Prozeralik*, 82 NY2d at 471). Rather, it accurately states that the Post subsequently learned of its error after attributing an erroneous report to the Los Angeles Times.

**9.** Contrary to the dissent's assertion, we do not "conclude[ ] that the erroneous statements must have been published as a result of mere mistake or negligence" (*see* dissenting op at 364). Our holding is limited to what the record reveals. It was plaintiff's burden to demonstrate that a reasonable jury assessing this evidence could find actual malice by clear and convincing evidence. He has failed to do so.

The dissent would "infer[ ]" actual malice from the Post's access to the accurate Los Angeles Times article, its inability to explain how its error occurred, and from the affidavit of a "journalism expert," opining that "no

Accordingly, the order of the Appellate Division should be affirmed, with costs.

PIGOTT, J. (dissenting). I respectfully dissent. The undisputed facts are relatively simple: The New York Post took a factually-accurate Los Angeles Times article, which stated that the California Medical Board had "moved to revoke" plaintiff's license, and rewrote the article to falsely state, in the headline and in the body of the article, that plaintiff's license had been "pulled" and "revoked." In my view, these facts raise, at the very least, a question of fact as to whether the Post acted with "actual malice."

## I.

On December 7, 2003, the Los Angeles Times (LA Times) ran a 98-paragraph story entitled: **"Harsh Reality of 'Osbournes' No Laughing Matter**." The article stated that "[t]he state medical board last week moved to revoke Kipper's license, accusing him of gross negligence in his treatment of other patients."

The Post obtained the LA Times story from the wire service and edited it from 98 paragraphs to eight. Apparently not satisfied with the headline, the Post changed it to falsely read: **"Ozzy's Rx doc's license pulled"** and reported: "Last week, the state medical board *revoked* Kipper's license, accusing him of gross negligence in his treatment of other patients, according to the Los Angeles Times" (emphasis supplied).

Plaintiff's attorneys wrote to the Post and advised it that the article stating that plaintiff's medical license had been revoked was "false and defamatory" and "published with reckless disregard for the truth." The letter demanded that the Post publish "a clear and unequivocal retraction of the . . . falsehoods . . . in a manner, size and placement comparable to those of the defamatory article."

The Post subsequently printed a correction on page 26. The correction was in incredibly small print, situated among mostly ads, and stated as follows:

---

rational journalist could have" made the same mistake that the Post did (*see id.* at 364 and n *). At most, this constitutes evidence of the discrete libel element of falsity, which is uncontested here, and of a failure to adhere to some objectively reasonable standard of reporting, which, standing alone, does not constitute clear and convincing evidence of actual malice.

"**Correction**

"On Dec. 7, 2003, The Post reported that, according to The Los Angeles Times, Dr. David Kipper, Ozzy Osbo[u]rne's doctor, had his license revoked by the California Medical Board. The Post has since learned that the board is still investigating Kipper's alleged practice of overprescribing drugs to celebrity patients and has moved to revoke his license, although no action has as yet been taken."

A fair reading of this "correction" is that the LA Times had made a mistake and further investigation by the Post had ferreted out the truth, a fact the Post is pointing out in an obscure part of its newspaper.

Supreme Court held that the Post's motion for summary judgment should be denied because it "has not presented evidence that proves, as a matter of law, that the false statements in the Article were published in good faith, the result of an inadvertent misreading or miscopying that would be considered an excusable mistake" (15 Misc 3d 1136[A], 2007 NY Slip Op 51005[U], *3). In making this determination, Supreme Court pointed to the deposition testimony of Post reporter Lyle Hasani Gittens that the Post's editors sometimes changed articles submitted by reporters and that, when editing wire service articles, the Post reporters routinely shortened them and changed the lead paragraph "to make it more Post-like," that is, "less boring than the Los Angeles Times." The Appellate Division reversed and dismissed the complaint (47 AD3d 597 [2008]).

## II.

In support of its contention that the record fails to contain evidence establishing actual malice with "convincing clarity," the Post relies on remarkably foggy testimony of the very people from whom the falsity originated, its own employees. Gittens, the reporter who edited the LA Times story for publication in the Post, testified that, because it came from the wire service, the LA Times article had likely already been fact-checked. Rather than exonerate the Post, this testimony underscores the significance of its conduct in printing false information, since defendant admits that the LA Times article was factually accurate before the Post edited it. Notwithstanding this fact, Gittens claims that he does not know how the false statement about plaintiff's license having been revoked found its way into the

article, nor does he recall editing the story to include that information. Todd Venezia, a reporter charged with editing Gittens's version of the story, testified that he occasionally edits the stories of other reporters but that he does not recall the specifics of the article at issue here.

The majority takes the position that based on the aforementioned testimony, there is a "lack of concrete proof" as to whether the Post "seriously doubted the truth of the complained-of statements or was highly aware that they were incorrect prior to publication" (majority op at 356). But the issue is not whether the Post doubted the truth or was aware of an incorrect statement here; it is conceded that the Post created the statements that, as the majority notes, are false and defamatory. A defendant should not be allowed to point to alleged deficiencies in the record that are the product of its employees' claimed inability to recall the circumstances surrounding the editing of the article and be awarded summary judgment. The majority correctly observes, "The circumstances surrounding the Post's erroneous statement are not entirely clear" (majority op at 351). But it is that lack of clarity upon which the majority relies in concluding that the record is devoid of any evidence that would permit a jury to find that the Post published the article with actual malice. In my view, the fact that defendant took a factually-accurate article and edited it to reflect something completely untrue constitutes sufficient evidence from which a jury could infer that defendant " 'in fact entertained serious doubts as to the truth of [its] publication,' *St. Amant* v. *Thompson*, 390 U. S. 727, 731 (1968), or acted with a 'high degree of awareness of . . . probable falsity,' *Garrison* v. *Louisiana*, 379 U. S. 64, 74 (1964)" (*Masson v New Yorker Magazine, Inc.*, 501 US 496, 510 [1991]).

The majority asserts that an inquiry into such matters is a subjective one that requires this Court to focus on the state of mind of the author at the time of the publication (majority op at 354-355). But this Court has held that to "conclude that no prima facie case was even presented [against a defendant] because its employees might have held an untarnished subjective state of mind" is not compelled by federal or state jurisprudence, and has cautioned that such an "approach and analysis . . . would erect a logically impossible test which, by its practical application of governing precedents, would inevitably result in no defamation case ever qualifying for jury resolution" (*Prozeralik v Capital Cities Communications*, 82 NY2d 466, 478 [1993]).

Essentially, the majority's opinion does what this Court sought to prohibit in *Prozeralik*: it places the disposition of defamation cases "into the unilateral control of defendant[ ]" (*id.*).

In my view, our Court's decision in *Prozeralik* compels the denial of the Post's motion for summary judgment. There, the defendant's news and radio casts identified the plaintiff—a public figure—as the victim of an abduction, and reported that the FBI was investigating whether said abduction was the result of the plaintiff having owed money to a criminal enterprise. There was a dispute, however, between the FBI and the defendant's reporter as to whether the FBI confirmed the plaintiff as the victim. Just hours after defendant last ran the inaccurate story, it was confirmed that the plaintiff was not the victim of the abduction, and the plaintiff subsequently filed a defamation suit against the defendant, eventually obtaining a favorable verdict.

This Court refused to grant the defendant's motion to dismiss the plaintiff's case, holding that the plaintiff met his "evidentiary burden of establishing actual malice sufficient to allow the jury . . . to find that defendant acted with a high degree of awareness of 'probable falsity' or entertained 'serious doubts' as to the truth of the broadcasts," stating that the plaintiff "adduced cogent direct evidence from which a jury could have *inferred* that defendant knew or suspected that the [plaintiff] was not the victim" (*Prozeralik*, 82 NY2d at 475 [emphasis supplied and citation omitted]). Such evidence included proof that a competing news station ran a story the previous evening identifying someone other than the plaintiff as the victim, speculation by the defendant's employees that the plaintiff was in fact the victim, and the disagreement between the FBI and the defendant's reporter as to whether the FBI told the reporter that he could "go with [the plaintiff's] name" if the FBI did not call the reporter back (*id.* at 475-476).

Here, as in *Prozeralik*, another media outlet reported a factually-accurate account of events the day before the false information was published by the Post. In my view, the conduct of the Post in this case is more egregious than the conduct of the defendant in *Prozeralik* because there is no dispute between the Post and the LA Times concerning the accuracy of the original article. Unlike the disagreement between the FBI and the reporter in *Prozeralik*, it is undisputed that plaintiff's license had not been revoked, and the Post concedes that those parts of the story concerning the revocation were in fact false. Moreover, it can be inferred from the mere fact that the substance of the

LA Times article was changed—without explanation—to erroneously reflect that plaintiff's license had been revoked that the Post entertained serious doubts as to the truthfulness of the article. Unlike the reporters in *Prozeralik* who speculated that the plaintiff was the victim, the Post *knew* or *should have known* from the body of the LA Times article that plaintiff's license had not been revoked.

As the majority states, proof of "[m]ere negligence does not suffice" to establish actual malice by clear and convincing evidence (*see Masson*, 501 US at 510). Whether defendant acted with mere negligence or actual malice, under the circumstances of this case, should be submitted to a jury, because an inference can be drawn from the facts in the record, with convincing clarity, that the Post acted with actual malice in publishing the article (i.e., it either knew that it was false or acted with reckless disregard of whether it was false or not).* Rather than allowing a jury to make that determination, however, the majority relies on the inability of the Post's employees to recall exactly how the false publication made it to print, and then concludes that the erroneous statements must have been published as a result of mere mistake or negligence (majority op at 359). In my view, this is error and deprives plaintiff of an opportunity to have a jury evaluate the credibility of the Post's employees. Therefore, I would reverse the order of the Appellate Division and reinstate plaintiff's complaint.

Chief Judge LIPPMAN and Judges GRAFFEO, READ, SMITH and JONES concur with Judge CIPARICK; Judge PIGOTT dissents and votes to reverse in a separate opinion.

Order affirmed, with costs.

---

\* It is important to note that plaintiff did not stand mute in the face of defendant's motion for summary judgment, but submitted, among other things, the affidavit of a journalism expert who averred that no rational journalist could have confused the meaning of the LA Times article with the meaning of the Post article and the only inference that could be drawn from that alleged mix-up (and the defamatory headline) was that the action was intentional.