Hafez v Accuracy in Media, Inc. (2026 NY Slip Op 50260(U))

[*1]

Hafez v Accuracy in Media, Inc.

2026 NY Slip Op 50260(U)

Decided on March 5, 2026

Supreme Court, New York County

Perry-Bond, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on March 5, 2026
Supreme Court, New York County

Yusuf Hafez, HANA MEMON, and 
 MICHELLE CAO, Plaintiffs,

againstAccuracy in Media, Inc., and ADAM GUILLETTE, Defendants.

Index No. 161112/2023

Plaintiffs: Beldock Levine & Hoffman LLP (Luna Droubi, Esq.)Defendants: Abrams Fensterman, LLP (Justin Kelton, Esq.) and Barr & Klein, PLLC (Benjamin Barr, Esq. admitted pro hac vice)

Phaedra F. Perry-Bond, J.

Upon the foregoing documents, Defendants' motion to dismiss Plaintiffs' Amended Complaint pursuant to CPLR 3211(a)(7) and (g), and for an award of attorneys' fees pursuant to New York Civil Rights Law § 70-a(1)(a) is denied.[FN1]
 
I. Background
In the aftermath of the barbaric attacks by Hamas on October 7, 2023, and the brutal retaliatory occupation of Gaza, tensions flared across the globe. In particular, the discord at New York's Columbia University gained significant notoriety. This lawsuit arises from the wake of those horrific and bloody events, and the ripple effect it had on Columbia's students.
Defendant Accuracy in Media, Inc. ("AIM") is a not-for-profit corporation that allegedly uses investigative journalism to expose bias, corruption, and public policy failings. Defendant Adam Guillette ("Guillette") is AIM's president. On October 23, 2023, Guillette, through AIM, purchased internet domain names and created websites in each of the Plaintiffs' names. Defendants used Plaintiffs' names and photographs to engage in a campaign that falsely claimed Plaintiffs were leaders of student organizations that signed an October 11, 2023 letter (the "Letter") which blamed Israeli policies for the October 7, 2023 attacks. The websites bearing Plaintiffs' names contained their pictures and labelled them as "Columbia's Leading Antisemite(s)."
As part of the campaign, Defendants created and funded mobile billboard trucks, which like the websites created by Defendants, displayed Plaintiffs' images and names and labelled them Columbia's Leading Antisemites. The billboards were driven around Columbia University, where Plaintiffs were enrolled. The mobile billboards were even allegedly sent to Plaintiffs' homes. Defendants used the websites and billboards to publicize their organization and solicit funds. Defendants' website allegedly contained a large "donate" button adjacent to a photograph of its mobile billboard containing Plaintiffs' names and photographs. However, none of the Plaintiffs were leaders of any student organization that signed the Letter.
Plaintiff Yusuf Hafez ("Hafez") was a Columbia University student studying civil engineering. Hafez was president of Turath, an Arab cultural group at Columbia, from September 2022 until May of 2023. Turath signed the Letter, but Hafez held no leadership or decision-making role in Turath at the time the Letter was signed. Despite Defendants acknowledging that non-party Yara Saabneh ("Saabneh") was Turath's president at the time the Letter was signed, and despite public information confirming Hafez had no role in Turath's leadership in October of 2023, Defendants still embarked on a public campaign of labelling Hafez as "Columbia's Leading Antisemite." As a result, aside from allegations of emotional and physical distress, Hafez allegedly had to attend classes remotely, was unable to engage in community groups, was unable to take at least one exam, and his grades and reputation suffered.
Plaintiff Hana Memon ("Memon") was a Barnard College student studying computer science and public policy. She was a former Vice President of the Muslim Student Association ("MSA") but held no leadership role in any student group at the time the Letter was signed. Memon was falsely accused by Defendants of being MSA's "Social Media Coordinator" despite never holding this position. Nonetheless, Defendants embarked on a public campaign labelling Memon as "Columbia's Leading Antisemite." As a result, Memon allegedly suffered emotional and physical distress so severe that she was granted an academic accommodation to not attend classes. She is also fearful for her reputation and future career prospects.
Plaintiff Michelle Cao ("Cao") was a third-year law student at Columbia Law School. Cao was never a member of any organization that signed the Letter. Nonetheless, Defendants labelled Michelle Cao as "Columbia's Leading Antisemite" based on the false assumption that Cao was a leader of a group called the "Conflict Resolution Collective." Like the other Plaintiffs, Cao allegedly suffered emotional and physical distress from Defendants' actions and has not attended a number of her classes. She fears for her future job prospects. As a result of Defendants' alleged actions, Plaintiffs sue for violations of New York Civil Rights Law §§ 50 and 51, defamation, and intentional infliction of emotional distress.
Defendants in turn move to dismiss pursuant to CPLR 3211(a)(7) and (g), and for attorneys' fees pursuant to New York Civil Rights Law § 70-a(1)(a). According to an affidavit [*2]from Guillete, he claims it is his opinion that student members of organizations that signed the Letter are antisemitic, and he believes his actions are immune from liability due to free speech. Guillete claims AIM's decision-making and verification process in labelling students as antisemitic relies on unspecified tips and undisclosed third-party contractors who research and identify "individual antisemites" (see NYSCEF Doc. 11). 
According to Guillete, Defendants identified Hafez as an antisemite based solely on an article from January 19, 2023, which identified Hafez as the president of Turath, a page from a Columbia networking site from October 20, 2023, which inaccurately listed Hafez as Turath's "primary contact," and a video from April 19, 2023 where Hafez claimed he was president of Turath (NYSCEF Docs. 14-15).[FN2]
According to Guillete, this was sufficient for Defendants to label Hafez as "Columbia's Leading Antisemite." In its decision to label Memon as "Columbia's Leading Antisemite," Defendants relied on one article from January 26, 2023 about ChatGPT which purportedly identified Memon as MSA's social media coordinator. In its decision to label Cao as "Columbia's Leading Antisemite," Defendants relied on one website identifying an unpictured individual named Michelle Cao as in charge of communications at Conflict Resolution Collective.[FN3]
Defendants claim after receiving Plaintiffs' complaint and amended complaint, it voluntarily removed all statements and images related to Plaintiffs. Based on these facts and their belated retractions, Defendants claim that they did not act with actual malice
Defendants further argue the defamation claims fail on numerous arguments, including, inter alia, that an accusation of antisemitism is non-actionable opinion, that Plaintiffs fail to allege cognizable damages, and that the defamatory statements are substantially true. Defendants claim the Civil Rights Law §§ 50 and 51 claims fail based on the newsworthiness exception and because the use of Plaintiffs' name and likeness was noncommercial. Finally, Defendants also argue the intentional infliction of emotional distress claim is duplicative. Plaintiffs oppose.
II. Discussion
A. Standard
When reviewing a pre-answer motion to dismiss for failure to state a claim, the Court must give the Plaintiff the benefit of all favorable inferences which may be drawn from the pleadings and determines only whether the alleged facts fit within any cognizable legal theory (Sassi v Mobile Life Support Services, Inc., 37 NY3d 236, 239 [2021]). All factual allegations are accepted as true (Allianz Underwriters Ins. Co. v Landmark Ins. Co., 13 AD3d 172, 174 [1st Dept 2004]).
A motion to dismiss under CPLR 3211(g) shall be granted when the movant shows the action targets speech involving public petition and participation, as defined in Civil Rights Law § 76-a, unless the opposing party shows the action has a substantial basis (see Gillespie v Kling, 217 AD3d 566, 567 [1st Dept 2023]). An action involves public petition and participation if it is "any communication in a place open to the public or a public forum in connection with an issue of public interest" or if it is "any other lawful conduct in furtherance of the exercise of the [*3]constitutional right of free speech in connection with an issue of public interest" (see Civil Rights Law § 76-a[1][a]). In 2020, the Legislature amended the anti-SLAPP law to "broaden the scope of the law and afford greater protections to citizens" (Aristocrat Plastic Surgery, P.C. v Silva, 206 AD3d 26, 28 [1st Dept 2022] quoting Mable Assets, LLC v Rachmanov, 192 AD3d 998, 1000 [2d Dept 2021], citing L 2020, ch 250).
In opposing a CPLR 3211(g) motion, a plaintiff must demonstrate that its claims have "a substantial basis in law or is supported by a substantial argument for an extension, modification or reversal of existing law" (see Reeves v Foundation for the Child Victims of the Family Courts, — N.Y.S.3d —, 2026 NY Slip Op. 00861 at *1 [1st Dept 2026]). The "substantial basis" standard is a "heightened burden" compared to the pleading standard under CPLR 3211(a)(7) (S.N. v Integral Yoga Institute, Inc. — N.Y.S.3d —, 2026 NY Slip Op. 00217 at *1 [1st Dept 2026]). However, "substantial basis" at the pleading stage does not require a showing of clear and convincing evidence for that is the burden of proof at trial (see Reeves, supra at *1; see also Zeitlin v Cohan, 220 AD3d 631, 632 [1st Dept 2023]). Instead, "substantial basis" for purposes of a motion to dismiss, requires "such relevant proof as a reasonable mind may accept as adequate to support a conclusion or ultimate fact" (see Smartmatic USA Corp. v Fox Corp., 213 AD3d 512 [1st Dept 2023]). "It is intended to be less than a preponderance of the evidence standard" (see Reeves v Associated News Papers, Ltd., 232 AD3d 10, 22 [1st Dept 2024]).
B. Public Petition & Participation
As a threshold matter, the Court first determines whether the heightened standard under CPLR 3211(g) applies. The Court finds CPLR 3211(g) applies to the facts alleged in the Amended Complaint.
The targeted communications were made on the internet and on mobile billboards rolling throughout Columbia University's campus. Therefore the communications were made "in a place open to the public or a public forum" (see, e.g. Gillespie v Kling, 217 AD3d 566, 567 [1st Dept 2023] [statements in online podcast were made in public forum]; Aristocrat Plastic Surgery, P.C. v Silva, 206 AD3d 26, 27-28 [1st Dept 2022] [online reviews were made in public forum]).
Second, the targeted speech is in connection with an issue of public interest. "Public interest" under the 2020 amendments to the anti-SLAPP law means "any subject other than a purely private matter" (see Civil Rights Law § 76-a[1][d]). Whether student leaders at one of the nation's most prominent universities are antisemitic is more than "a purely private matter", especially in the aftermath of the events of October 7, 2023 (see, e.g. Sharp v Bar Fluid LLC, 237 AD3d 628, 629 [1st Dept 2025] [matters of political, social, or other concern to the community constitute matters of public interest]). Therefore, the targeted speech is within the ambit of the anti-SLAPP law. The heightened CPLR 3211(g) standard, which requires that Plaintiffs' claims have a substantial basis in law, applies.
C. Civil Rights Law §§ 50 and 51
The motion to dismiss the Civil Rights Law §§ 50 and 51 claims are denied. A violation of Civil Rights Law § 50 occurs when someone "uses for advertising purposes . . . the name, portrait, picture, likeness, or voice of any living person without having first obtained the written consent of such person." Civil Rights Law § 51 provides for a private cause of action seeking damages and injunctive relief as a result of a Civil Rights Law § 50 violation.
Under Civil Rights Law § 50, a name, portrait or picture is used for advertisement "if it appears in a publication which, taken in its entirety, was distributed for use in, or as part of, an [*4]advertisement or solicitation for patronage" (Darden v OneUnited Bank, 185 AD3d 1004, 1006 [2d Dept 2020] quoting Beverley v Choices Women's Medical Center, Inc., 78 ny2d 745, 751 [1991]). It is possible for a publication to serve both an educational purpose and an advertising purpose, for the "ultimate objective of commercial advertising is to educate the public as to the advantages and virtues of [services] and thereby stimulate demand therefore" (see Selsman v Universal Photo Books, Inc., 18 AD2d 151, 152 [1st Dept 1963]).
Here, there is no dispute that Defendants used Plaintiffs' name and image on their websites and mobile billboards without Plaintiffs' consent. Plaintiffs allege the billboards and websites containing Plaintiffs' images were advertisements because it contained AIM's logo, and AIM's website contained a photograph of its billboard trucks with unauthorized digital displays featured prominently next to a "donate" button. This allegation could lead a reasonable person to conclude Plaintiffs' names and likeness were used for a commercial purpose, especially since AIM is a non-profit that plausibly receives most of its income through donations. The dramatic and inflammatory nature of AIM's actions, which were depicted in photographs adjacent to the "donate" button, could also lead a reasonable person to conclude that Plaintiffs' names and likeness were used as clickbait [FN4]
advertising or an attempt to go viral [FN5]
with the intention of publicizing AIM as an organization on the internet to gain more patronage through donations.
At this pre-answer juncture, Defendants' argument as to the newsworthy exception is not dispositive. Antisemitism at one of the country's leading universities is newsworthy. However, whether Plaintiffs' names and likeness were being used as an advertisement in disguise (i.e., with the intent of making AIM go "viral," gain notoriety, and solicit donations) remains an issue of fact which requires discovery (see Beverley v Choices Women's Medical Center, Inc., 78 NY2d 745, 752-753 [1991] [defendant may not "unilaterally neutralize or override the long-standing and significant statutory privacy protection by wrapping its advertising message in the cloak of public interest, however commendable the educational and informational value"]). Denial of the motion is further warranted because discovery may show the newsworthiness exception does not apply because there was sufficient available information to Defendants such that they should have known the use of Plaintiffs' names and images had nothing to do with fighting antisemitism at Columbia University (see, e.g. Messenger ex rel. Messenger v Gruner + Jahr Printing and Pub., 94 NY2d 436, 442-443 [2000] [newsworthiness exception does not apply where the images used have no real relationship to the article or the article is an advertisement in disguise]). Therefore, the motion to dismiss the Civil Rights Law §§ 50 and 51 claims is denied.
D. Defamation
The motion to dismiss the defamation claim is denied. For purposes of a pre-answer motion to dismiss, even under the more rigorous "substantial basis" standard, Plaintiffs have [*5]sufficiently alleged claims for defamation. "Defamation is the making of a false statement about a person that 'tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him [or her] in the minds of right-thinking persons, and to deprive him [or her] of their friendly intercourse in society'" (see Frechtman v Gutterman, 115 AD3d 102, 104 [1st Dept 2014] quoting Rinaldi v Holt, Rinehart & Winston, 42 NY2d 369, 379 [1977], cert. denied 434 US 969 [1977]). To allege defamation, there must be (1) a false statement (2) published to a third party, (3) without privilege or authorization, (4) which causes plaintiff harm, unless the statement is one of the types of publications actionable regardless of harm (see Cardali v Slater, 56 Misc 3d 1003, 1008 [Sup. Ct., NY County 2017] citing Dillon v City of New York, 261 AD2d 34, 38 [1st Dept 1999]). Here, there is no dispute that the allegedly defamatory statements were published to third parties without Plaintiffs' consent.
While Defendants argue that Plaintiffs failed to allege damages, the Court finds this argument to be without merit, especially at this pre-answer motion to dismiss stage. The United States Supreme Court has made clear that "actual injury" for purposes of damages on a defamation claim customarily includes "impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering" (see Nolan v State, 158 AD3d 186, 191-192 [1st Dept 2018] quoting Gertz v Robert Welch, Inc., 418 US 32, 350 [1974]). Plaintiffs allege their reputations in the community were so harmed and they suffered humiliation so severely that they stopped attending classes, missed exams, and Memon's experience was so bad she was granted an academic accommodation. Plaintiffs further allege they suffered reputational and economic harm since the defamatory statements prevented them from procuring post-graduation employment.
In any event, where, as here, the allegedly defamatory statements expose the plaintiffs to public contempt and ridicule and "induce an evil opinion of him [or her] in the minds of right-thinking person" a plaintiff need not allege special damages (Rinaldi v Holt, Rinehart 7 Winston, 42 NY2d 369, 379 [1977], cert. denied 434 US 969 [1977]; see also LeBlanc v Skinner, 103 AD3d 202, 214 [2d Dept 2012]). Labelling someone a "leading antisemite" would, in the mind of a right-thinking person, induce an evil opinion of the labelled individual.
Defendants' several arguments for the allegedly defamatory statements being non-actionable fail, at least on this pre-answer motion to dismiss. First, Defendants' take the irreconcilable positions that an accusation of antisemitism is a non-actionable opinion and then argue in the very same brief that the accusations of antisemitism are substantially true.
Putting that contradiction aside, and given the context of this case, labelling Plaintiffs "Columbia's Leading Antisemites" is an actionable mixed opinion. The First Department has repeatedly found that statements alleging cultural insensitivity and racism that "imply they are based upon facts which justify the opinion but are unknown to those reading it" can constitute actionable mixed opinions (see, e.g. Davis v Brown, 211 AD3d 524, 525 [1st Dept 2022] [letter implying Plaintiff was responsible for culturally insensitive show, even though she took no part in managing, directing, or approving the show, was actionable]; Pezhman v City of New York, 29 AD3d 164, 168 [1st Dept 2006] [letter falsely claiming teacher was mentally incompetent and racist was actionable]; see also Guerrero v Carva, 10 AD3d 105, 112-113 [1st Dept 2004] [flyers falsely alleging plaintiffs engaged in racial discrimination against employees were actionable]). Considering Defendants hold themselves out to be investigative journalists, their statement that Plaintiffs were "Columbia's Leading Antisemites" implies the statements were not mere opinion but were based on some facts showing Plaintiffs were actually leading antisemitic [*6]campaigns (see also Stega v New York Downtown Hospital, 31 NY3d 661, 676 [2018]; Sheridan v Carter, 48 AD3d 444, 446-447 [1st Dept 2008] [published statements that plaintiffs were racists who abused and economically exploited domestic employee were defamatory per se]).
The argument that Plaintiffs do not deny being antisemitic or that the statements are "substantially true" are without merit as Plaintiffs were not leaders of any organization that signed the Letter, and Plaintiffs obviously deny being antisemitic by virtue of filing this lawsuit. Defendants' argument that they were simply asserting Plaintiffs' political association is likewise unavailing. The defamatory nature of the statements is not that Plaintiffs were associated with certain student groups — the defamatory statements arise from falsely accusing Plaintiffs of being "leading antisemite." Defendants' argument based on the incremental harm doctrine is likewise unpersuasive. 
Finally, Plaintiffs have alleged actual malice in nonconclusory fashion (see, e.g. Irizarry v Zelaya, 244 AD3d 591, 593 [1st Dept 2025]). Plaintiffs have set forth sufficient facts that Defendants published their statements about Plaintiffs in a grossly irresponsible manner (see, e.g. Lewis v Newsday, Inc., 246 AD2d 434, 435 [1st Dept 1998] citing Chapadeau v Utica Observer-Dispatch, 38 NY2d 196, 199 [1975]). It remains an issue of fact whether Defendants' reliance on an undisclosed third-party vendor to investigate Plaintiffs, and the widespread publication of serious and inflammatory statements based on very limited, outdated, and/or inaccurate articles rises to the level of reckless disregard sufficient to meet the actual malice standard (see also Smartmatic USA Corp. v Fox Corp., 213 AD3d 512, 512-513 [1st Dept 2023]). This is especially the case as Plaintiffs allege the information would have been easily verifiable through other available online sources, and implicitly the information could have been verified by seeking comment from the Plaintiffs themselves. Discovery may show that Defendants were so motivated by capitalizing off the events at Columbia that they did not care about the truth so long as they increased their donations and internet traffic.
Defendants' reliance on Kipper v. NYP Holdings Co., Inc., 12 NY3d 348 (2009) only highlights why the issue of actual malice cannot be determined in this case at the pre-answer stage. The Kipper decision was issued on summary judgment, after an exchange of discovery and a more fully developed evidentiary record. Therefore, the defamation claim is sustained.
E. Intentional Infliction of Emotional Distress
At this pre-answer, pre-discovery stage, where Plaintiffs are entitled to plead in the alternative, the motion to dismiss the intentional infliction of emotional distress claim is denied (Brown v Riverside Church in City of New York, 231 AD3d 104, 109 [1st Dept 2024]; see also 164 Mulberry Street Corp. v Columbia university, 4 AD3d 49 [1st Dept 2004]). The alleged conduct is sufficiently extreme and outrageous. Specifically, it is alleged that Defendants sought to elicit donations, gain notoriety, and intentionally ruin graduating students' careers based on the false assumption that those students were "leading antisemites" — an assumption allegedly made through little to no due diligence. Further, Defendants used Plaintiffs' personal photographs without their permission and put them on mobile billboards which roamed campus and even allegedly went to Plaintiffs' homes with the intent of humiliating and intimidating them (see, e.g. Lopez v Trahan, 234 AD3d 552, 554 [1st Dept 2025] [issue of fact as to whether defendant's conduct was a deliberate and malicious campaign of harassment and intimidation]; see also Waterbury v New York City Ballet, Inc., 205 AD3d 154 [1st Dept 2022]). Therefore, the motion to dismiss the intentional infliction of emotional distress claim is denied, at this juncture [*7](see also Paulino v Paulino, 170 AD3d 629, 629-630 [1st Dept 2019]).
Because Defendants have not succeeded on their CPLR 3211(g) motion, the branch of the motion under CPLR 3211(a)(7) necessarily fails. Moreover, because Defendants have not yet successfully obtained dismissal, any award of fees under Civil Rights Law § 70-a(1)(a) is premature. The Court has considered the remainder of Defendants' contentions and finds them to be unavailing.
Simply put, this is a pre-answer motion to dismiss, and at this juncture, Plaintiffs' allegations are sufficient. The Court is mindful of the context here: namely that Plaintiffs were seeking to graduate and enter the workforce just as Defendants falsely slapped them with the grave accusation of being "leading antisemites." Accepting the facts alleged as true, antisemitism is not an issue for Defendants to profit from by impermissibly utilizing Plaintiffs' names and images while simultaneously and recklessly destroying Plaintiffs' health and reputations. For this reason, the Complaint survives under both CPLR 3211(g) and 3211(a)(7). Defendants' motion is denied, and Plaintiffs' allegations must be tested through discovery.
Accordingly, it is hereby,
ORDERED that Defendants' motion to dismiss is denied in its entirety; and it is further
ORDERED that within twenty days of entry, Defendants shall serve an Answer to Plaintiffs' Amended Complaint; and it is further
ORDERED that the parties shall meet and confer immediately and submit a proposed preliminary conference order to the Court via e-mail, but in no event shall the proposed order be submitted any later than April 28, 2026. If the parties have a serious dispute over discovery requiring Court intervention, they shall notify the Court so an in-person conference can be scheduled; and it is further
ORDERED that if the parties elect to resolve this matter through the Court's ADR program, they shall notify the Court so the appropriate referral order can be made; and it is further
ORDERED that within ten days of entry, counsel for Plaintiffs shall serve a copy of this Decision and Order, with notice of entry, on all parties via NYSCEF.
This constitutes the Decision and Order of the Court.
DATE March 5, 2026HON. PHAEDRA F. PERRY-BOND, J.S.C.

Footnotes

Footnote 1:The parties appeared before Hon. Richard Latin for oral argument on July 17, 2024. Justice Latin never issued a decision following oral argument and has since retired.

Footnote 2:At the time the Letter was signed, Turath's website identified the new leadership board, on which Hafez played no role.

Footnote 3:Cao was a law student and the Conflict Resolution Collective was part of a wholly separate school that Cao allegedly has no affiliation with.

Footnote 4:Merriam-Webster defines clickbait as "something designed to make readers want to click on a hyperlink, especially when the link leads to content of dubious value or interest. The posts could equally be considered "rage-bait" which Merriam-Webster defines as "online content that is intentionally offensive or provocative."

Footnote 5:In the context of online content, Merriam-Webster defines "viral" as "quickly and widely spread or popularized especially by means of social media.